# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE

| | | |
|---|---|---|
| STATE OF NEW YORK, Plaintiff, | : | **Index No.** |
| - against - | : | **COMPLAINT** |
| INTERNATIONAL JOINT COMMISION, Defendant. | : | |

Plaintiff State of New York (the State or New York), as and for its complaint against defendant International Joint Commission (the IJC or Commission), alleges as follows upon information and belief:

**INTRODUCTION**

1. This action arises from the IJC's negligence and failure to adhere to its own mandated protocol for operation of the Moses-Saunders Power Dam (the Dam) during flooding events in 2017 and 2019. The Dam is located across the St. Lawrence River, through which, at the location of the Dam, the border runs between the United States and Canada. The IJC is responsible for controlling the flow of water from Lake Ontario down the St. Lawrence River by directing the operation of the Dam.

2. In the event of extremely high water levels in Lake Ontario, the IJC's Dam-operation protocol requires the Commission to operate the Dam to provide "all possible" flooding relief to riparian property owners along Lake Ontario upstream of the Dam, subject only to protecting owners downstream of the Dam. During the severe flooding in 2017 and 2019, however, the IJC chose not to implement its flood relief protocol, which required the Commission to increase outflows through the Dam to the maximum extent possible. The

Commission's actions and failures to act caused serious flooding on the south shores of Lake Ontario within New York and damages to the State, including: damage to the State's property; damages consisting of monies the State spent and will spend to mitigate or repair harms to its property and harms to municipalities, residents, and local businesses on the New York shores of Lake Ontario; and natural resource damages, including the value of lost recreational opportunities during the time State facilities were closed for repairs or were submerged under floodwaters. The State brings this action against the IJC to recover those damages.

**PARTIES**

3. Plaintiff State of New York is a sovereign entity. New York, as a body politic and sovereign entity, brings this action on behalf of its departments and agencies (including, but not limited to the Department of Environmental Conservation; the Department of Transportation; the Division of Homeland Security & Emergency Services; the Division of Military and Naval Affairs; and the Office of Parks, Recreation and Historic Preservation), as a property owner, as *parens patriae* and representative of all residents and citizens of New York, as trustee and guardian of New York's natural resources, and on its own behalf in its sovereign and proprietary capacities.

4. The IJC is a binational U.S.-Canadian entity created by the U.S.-Great Britain Boundary Waters Treaty of 1909 (the Boundary Waters Treaty), 36 Stat. 2448. (At that time, Canada was a Dominion of Great Britain.) The IJC is an "international organization" within the meaning of the International Organizations Immunities Act, 22 U.S.C. § 288. *See* Executive Order No. 9,972, 13 Fed. Reg. 3573 (June 29, 1948). The IJC includes the International Lake Ontario-St. Lawrence River Board, which the IJC created to vary the flows of water through the Dam and the water levels of Lake Ontario and the St. Lawrence River.

5. The IJC is subject to suit in this Court. The International Organizations Immunities Act, 22 U.S.C. § 288a(b), provides that international organizations have the "same immunity from suit and every form of judicial process as is enjoyed by foreign governments." This means that international organizations like the IJC are subject to the waiver of sovereign immunity set forth in the Foreign Sovereign Immunities Act (the FSIA), 28 U.S.C. § 1605, *see Jam v. Int'l Finance Corp.*, 139 S. Ct. 759, 772 (2019), and are subject to the jurisdiction of state courts. Section 1605(a)(5) of the FSIA provides an exception to sovereign immunity for in any case "in which money damages are sought against a foreign state for . . . damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."

6. The FSIA protects international organizations from claims based on the exercise or performance of a "discretionary function." *See* 28 U.S.C. § 1605(a)(5)(A). The State's claims in this case are not based on IJC's exercise or performance of a discretionary function. Rather, the State's claims arise from IJC's failure to fulfill its non-discretionary duty to operate the Dam in a specified manner during periods of extremely high water levels in Lake Ontario and in accordance with the standard of reasonable care required by law.

## FACTUAL ALLEGATIONS

### A. Background

7. The Boundary Waters Treaty established the IJC to review and approve certain types of proposed obstructions or diversions in boundary waters between the U.S. and Canada. *See* Boundary Waters Treaty, Article III. One such boundary water is a portion of the St. Lawrence River.

8. Pursuant to the Boundary Waters Treaty and with the approval of the IJC, the Dam was constructed in the 1950s across the U.S-Canadian border in the "International Rapids Section" of the St. Lawrence River. The Dam, which generates hydroelectric power, is located about seventy-five miles southwest from Montreal.

9. The Dam serves a crucial role in regulating water levels in Lake Ontario and the St. Lawrence River. In turn, the Dam also serves a crucial role in regulating water levels in the St. Lawrence Seaway, a system of locks, canals, and channels that allows ships to travel from the Atlantic Ocean to the western end of Lake Superior. The Seaway is a major trade route and generates billions of dollars per year in business revenues.

10. The IJC's regulations for operating the Dam have changed over time, including in 2016, when the IJC adopted a regulation known as "Plan 2014." The IJC adopted Plan 2014 largely to address environmental problems, including restoring wetlands and wildlife and adjusting to climate change.

11. Among other things, Plan 2014 sets forth parameters for regulating the outflow of water through the Dam.

12. If water levels in Lake Ontario reach extremely high or low levels—known as "trigger levels," Plan 2014's protocols require "major deviations" from normal flow limits.[1] In the event of "extremely high levels" of water in Lake Ontario, Plan 2014 requires that the Dam "*shall* be operated to provide *all possible relief to the riparian owners* [i.e., owners of shoreline real property] upstream and downstream." Plan 2014 at p. 56, Appendix A, Regulation Condition H14 (Regulation H14) (emphasis supplied). In contrast, in the event of "extremely low levels" of water in Lake Ontario, Plan 2014 provides that the Dam "shall be operated to

[1] Plan 2014, at p. 71, Annex C § C3, Major Deviations, *available at* https://legacyfiles.ijc.org/tinymce/uploaded/LOSLR/IJC_LOSR_EN_Web.pdf (last visited November 7, 2019).

provide all possible relief to municipal water intakes, navigation [i.e., commercial shipping] and power purposes, upstream and downstream." *Id.*

13. During the flooding events of 2017 and 2019, the IJC failed to increase the amount of water allowed to flow through the Dam to provide "all possible relief" to riparian owners along Lake Ontario upstream of the Dam, as required by Regulation H14. Instead, the IJC prioritized commercial shipping interests, causing large-scale injuries and damages to the State.

14. When Lake Ontario water levels surpassed the trigger level in April 2017, the IJC failed to act, despite knowing that the water levels in Lake Ontario exceeded the trigger level. By late May 2017, Lake Ontario water levels had risen to levels not seen since recordkeeping began in 1918. At that point, the IJC took only very limited action to deviate from the Plan 2014 protocols governing non-extreme water levels and allowed the release of some additional water.

15. Because of the IJC's actions and inactions, Lake Ontario water levels remained extremely high and above the Plan 2014 trigger level for more than 100 days, resulting in severe erosion of the shoreline, property damage, the shuttering of businesses, and other damage on the New York side of Lake Ontario, including in Monroe County. The IJC failed to act even though greater outflows from the Dam were possible and would have brought swifter relief to the New York communities along Lake Ontario.

16. A similar chain of events transpired in the spring and summer of 2019, when Lake Ontario water levels surpassed even the levels reached in 2017. The IJC's actions and inactions again resulted in extremely high water levels in Lake Ontario above the Plan 2014 trigger level for more than 100 days, causing additional and extensive damage.

17. The IJC again justified this imposition on riparian owners in New York by noting the economic interests of the commercial shipping industry.

**B. Construction of the Dam and the Generation of Hydroelectric Power**

18. In 1952, the United States and Canada applied to the IJC for approval to develop the Dam, a major hydropower project on the St. Lawrence River across the U.S.-Canadian border. The IJC approved construction of the Dam that same year and it became operational in 1958.

19. The Dam supplies electricity to consumers in the United States and Canada. It generates enough electricity on the U.S. side to power a city roughly the size of Washington, D.C., which has a population of more than 600,000.

20. The Dam also is the principal structure used to regulate water outflows from Lake Ontario. The following is a diagram of the Lake Ontario-St. Lawrence River Drainage Basin, which shows the location of Lake Ontario and the Dam.



C. **Regulation of Water Outflows Through the Dam**

21. In 1952, the IJC issued an "Order of Approval" setting forth conditions for the operation of the Dam. The Order of Approval also created the International St. Lawrence River Board of Control (the Board of Control) to ensure that the release of water from the Dam conformed to the IJC's directives.

22. In 1956, the IJC issued a Supplementary Order of Approval, which set forth an amended regulatory plan for the Dam.

23. In 1999, the IJC wrote to the U.S. Secretary of State and the Canadian Foreign Minister, requesting the governments' support in conducting a review of the IJC's regulations governing outflows of waters from Lake Ontario through the Dam.

24. According to the IJC, a review was necessary to determine whether the regulations—by then in place for nearly four decades and based on regulatory objectives from the 1950s and historic hydrological conditions—should be revised "in view of dissatisfaction on the part of some riparians and boaters, in light of environmental concerns, and because of the potential for climate change to affect lake levels."[2]

25. The two governments approved the IJC's request and appropriated funds for a study. This study culminated more than sixteen years later in Plan 2014.

26. Plan 2014 aims "to provide for more natural variations of water levels of Lake Ontario and the St. Lawrence River that are needed to restore ecosystem health. It will continue to moderate extreme high and low water levels . . . ."[3]

27. Specifically, Plan 2014 sets out a method for calculating the appropriate amount of water releases from Lake Ontario, based on updated hydrological data and Plan 2014's

[2] Plan 2014, at pp. 11-12, §§ 2.2.1-2.2.2.
[3] *Id.* at p. iii.

regulatory objectives. The releases are also subject to specified "flow limits," which place upper and lower bounds on the permissible releases from Lake Ontario in order to address specific conditions and concerns during normal conditions.

28. As discussed above (in paragraph twelve), however, when water levels reach extremely high or low "trigger levels," Plan 2014's protocols require "major deviations" from normal flow limits,[4] including implementation of Regulation H14's requirement that the Dam "*shall* be operated to provide *all possible relief to the riparian owners* upstream and downstream" (emphasis supplied).[5] As the IJC has recognized, this is a "require[ment]."[6]

29. The U.S. and Canada consented to Plan 2014, which the IJC adopted in 2016.

30. In adopting Plan 2014, the IJC in December 2016 issued a Supplementary Order of Approval, which provides that "[i]n accordance with Article VIII of the [Boundary Waters] Treaty, interests on either side of the International Boundary which are injured by reason of the construction, maintenance and operation of the [Dam] shall be given suitable and adequate protection and indemnity as provided by the laws in Canada, or the Constitution and laws in the United States respectively."[7]

31. That Supplementary Order of Approval therefore provides that the IJC is subject to laws in the United States, including the laws of the State of New York.

32. To implement Plan 2014, the IJC transformed the Board of Control into the International Lake Ontario-St. Lawrence River Board (the River Board). The River Board is a

[4] *Id.* at pp. 71-72 and Table C1, *Lake Ontario Trigger Levels for Major Deviations*.
[5] *Id.* at p. 56, Regulation H14.
[6] *Id.* at p. 21 § 3.2.4.
[7] Regulation Plan 2014 for the Lake Ontario and the St. Lawrence River, Compendium Document (December 2016), at p. 4 ¶ A, *available at* https://ijc.org/sites/default/files/2018-08/Plan2014_CompendiumReport_1.pdf (last visited November 7, 2019); *accord* Plan 2014, at p. 53, Regulation A.

subsidiary of the IJC and has the responsibility to "set flows from Lake Ontario into the St. Lawrence River through the [Dam] in accordance with the Order of Approval."[8]

**D. During Extreme Flooding in 2017, the IJC Failed to Provide "All Possible Relief" to Riparian Property Owners, Causing Massive Damages**

33. From January 2017 to May 2017, the Lake Ontario and St. Lawrence River basin experienced extremely high levels of precipitation. Areas upstream of Lake Ontario also received record precipitation, resulting in high water levels in Lake Erie, which feeds Lake Ontario.

34. By late April 2017, water levels in Lake Ontario reached the Plan 2014 high water trigger level that required the IJC to provide "all possible relief" to protect riparian property owners.

35. Despite water levels having reached the trigger level, the IJC failed to materially increase outflows from Lake Ontario.

36. As a result of the IJC's actions and failures to act, New York communities along the shores of Lake Ontario experienced severe flooding.

37. On April 28, 2017, the Commissioner of the New York State Department of Environmental Conservation (DEC) declared an emergency in counties along the shores of Lake Ontario and issued an emergency general permit to allow for cleanup and restoration work.

[8] International Joint Commission, International Lake Ontario-St. Lawrence River Board Directive (Dec. 8, 2016), at p. 2, *available at* https://ijc.org/sites/default/files/2019-04/LOSLRB-Directive-2016.pdf (last visited November 7, 2019).

38. On May 2, 2017, New York Governor Cuomo also declared a state of emergency for the eight New York counties affected by the Lake Ontario flooding (Cayuga, Jefferson, Monroe, Niagara, Orleans, Oswego, St. Lawrence, and Wayne counties).

39. The Governor deployed equipment, response teams, and hundreds of thousands of sandbags to the region to mitigate the harm and damage from the flooding.

40. The State also formally requested that the IJC release additional water to reduce the flooding.

41. On May 24, 2017, the IJC increased the volume of water released through the Dam to provide relief to riparian areas upstream of the Dam. Even then, however, the IJC set the level of outflows well below the maximum possible amount that could be released from Lake Ontario.

42. By the end of May 2017, the water level in Lake Ontario had exceeded the highest level observed since recordkeeping began nearly a century before in 1918.

43. Lake Ontario water levels remained above the trigger level until the last week of August.

44. While the IJC has identified the maximum outflow from the Dam as 11,500 cubic meters per second, the IJC never allowed outflows from the Dam to exceed 10,400 cubic meters per second, even though water levels reached around 249 feet above mean sea level (MSL). (The average peak water level of Lake Ontario from 1918 to 2016 was about 246 feet above MSL.[9] Thus Lake Ontario water levels in 2017 reached about three feet higher than those average peak levels.) In contrast, when water levels in 1993 reached around 247 feet

[9] International Lake Ontario-St. Lawrence River Board, Observed Conditions & Regulated Outflows in 2017 (May 25, 2018), at p. 27, *available at* https://legacyfiles.ijc.org/tinymce/uploaded/ISLRBC/ILOSLRB_SummaryReport.pdf (last visited November 7, 2019).

above MSL, the IJC allowed outflows from the Dam to peak at 10,900 cubic meters per second.

45. The IJC justified this imposition on New York's riparian owners by noting the economic interests of the commercial shipping industry.[10]

46. Areas downstream of the Dam could have accommodated additional outflows of water from Lake Ontario.

47. The IJC's failure to release additional water through the Dam contravened the non-discretionary mandate of Regulation H14 to "provide all possible relief to the riparian owners upstream and downstream."

48. The IJC's actions and inactions also breached the applicable standard of reasonable care and caused foreseeable harm to riparian owners in Lake Ontario.

49. The prolonged flooding was disastrous for thousands of New York businesses and residents along the Lake Ontario shoreline.

50. DEC issued more than 3,000 permits and authorizations for projects to restore the shoreline and respond to the flooding.

51. In late 2017, a committee of the IJC surveyed Lake Ontario residents about the effects of the flooding earlier that year. Roughly ninety percent of respondents from New York reported some degree of flooding of their property; residents in Monroe County had the highest percentage of flooding. Around seventy percent of New York respondents reported that the high water levels had caused erosion damage, including loss of land, damage to buildings and shore protection structures, and loss of vegetation.[11]

[10] *Id.* at pp. 7, 32, 34.
[11] 2017 High Water Levels: A Summary of Reported Impacts by Shoreline Property Owners on Lake Ontario and the St. Lawrence River, Great Lakes-St. Lawrence River Adaptive Management Committee (April 2019), *available at*

### E. During Severe Flooding in 2019, the IJC Again Failed to Provide "All Possible Relief" to Riparian Property Owners, Causing Additional and Substantial Damages

52. In the winter of 2018 and spring of 2019, the Lake Ontario and St. Lawrence River basin again experienced extremely high levels of precipitation. The precipitation and melting snowpack caused Lake Ontario's water levels to rise to extremely high levels.

53. In a February 23, 2019 letter to the IJC, Governor Cuomo noted the rise in water levels and warned that "[u]pcoming weather patterns raise further concerns about potential renewed flooding." Governor Cuomo "urge[d] [the IJC] to use all means to maximize outflows from the Lake Ontario system and reduce the risk for potential flooding this year."[12]

54. Water levels continued to rise throughout March and April 2019.

55. On April 29, 2019, the Commissioner of the DEC declared that "an emergency situation exists" in counties along the shores of Lake Ontario and authorized the issuance of general permits to allow for cleanup and restoration work.[13]

56. The New York State Office of Emergency Management mobilized extensive resources to address the rising water levels. The State activated the State Emergency Operations Center for 125 days to conduct operations across eight New York counties and hundreds of miles of shoreline.

57. Other State staff, including from DEC and the New York National Guard, fortified public and private shorefront property with water barriers and other equipment. The

---

https://ijc.org/sites/default/files/2019-08/Final_QuestionnaireFactSheet_20190815.pdf (last visited November 7, 2019).

[12] Governor Cuomo Issues Letter Calling on International Joint Commission to Maximize Lake Ontario Outflows, Governor Andrew M. Cuomo (Feb. 23, 2019), *available at* https://www.governor.ny.gov/news/governor-cuomo-issues-letter-calling-international-joint-commission-maximize-lake-ontario (last visited November 7, 2019).

[13] State of New York, Department of Environmental Conservation, Emergency Declaration and Finding Pursuant to ECL 70-0111(d) and 70-0116, In the Matter of Damage Caused by High Water Levels in Lake Ontario (April 29, 2019), *available at* http://www.dec.ny.gov/docs/permits_ej_operations_pdf/2019lakeontarioemergdec.pdf (last visited November 7, 2019).

State also distributed more than one million sandbags to counties and local municipalities, including in Monroe County.

58. By May 10, 2019, the water levels had risen even further and reached the high water trigger level, requiring the IJC to "provide all possible relief to riparian owners upstream and downstream" of the Dam.

59. On May 20, 2019, Governor Cuomo declared a state of emergency in the same eight New York Counties affected by Lake Ontario flooding in 2017, including Monroe County.[14]

60. By June 2, 2019, Lake Ontario water levels had risen to around 249 feet, which is about three feet higher than historic average peak levels.

61. On June 8, 2019, Governor Cuomo sent a letter to the IJC, stating that "[w]ith water levels in Lake Ontario now exceeding the historic high levels of 2017, immediate action must be taken to deter flooding in the Lake Ontario-St. Lawrence River System."[15]

62. By June 13, 2019, the IJC allowed outflows to reach 10,400 cubic meters per second, the maximum outflow that was attained in 2017.[16]

63. As in 2017, greater outflows were possible and would have provided swifter relief to communities upstream of the Dam.

---

[14] Governor Cuomo Declares State of Emergency for Eight Counties Impacted by Lake Ontario Flooding, Governor Andrew M. Cuomo (May 20, 2019), *available at* https://www.governor.ny.gov/news/governor-cuomo-declares-state-emergency-eight-counties-impacted-lake-ontario-flooding (last visited November 7, 2019).

[15] Governor Cuomo Issues Letter to The International Joint Commission Demanding Immediate Action in Response to Lake Ontario Flooding (June 8, 2019), *available at* https://www.governor.ny.gov/news/governor-cuomo-issues-letter-international-joint-commission-demanding-immediate-action-response (last visited November 7, 2019).

[16] Lake Ontario outflows to be maintained above navigation limit, International Lake Ontario-St. Lawrence River Board (June 17, 2019), *available at* https://ijc.org/en/loslrb/lake-ontario-outflows-be-maintained-above-navigation-limit (last visited November 7, 2019).

64. Likewise, areas downstream of the Dam could have accommodated additional outflows from Lake Ontario.

65. On July 8, 2019, the IJC acknowledged that "[o]utflows at maximum system capacity for 4 weeks would hasten the recovery of Lake Ontario in the short term." But the IJC decided not to increase outflows because that would "require the Seaway Corporations to shut down shipping" on part of the St. Lawrence River, among other things.[17]

66. Thus the IJC prioritized the interests of the shipping industry before the interests of Lake Ontario riparian property owners, whose homes and businesses were submerged for the second time in three years. The IJC's actions and failures to act were contrary to the non-discretionary mandate of Regulation H14 and the applicable standard of reasonable care.

67. As a result of the IJC's actions and failures to act, water levels exceeded the trigger level through late September.

### F. The IJC's Actions and Failures to Act During the Flooding in 2017 and 2019 Caused Serious Harm to New York and its Citizens

68. As a result of the IJC's actions and failures to act in response to flooding in 2017 and 2019, the State incurred substantial damages.

69. Flooding on the shores of Lake Ontario in 2017 caused damages in excess of $4 million to State property, including damage to State parks, beaches, campgrounds, boat docks, and boat launches. Flooding in 2019 caused damages in excess of $2 million to State facilities. Additionally, the public lost the value of the use of some of these facilities while they were closed for repairs or remained submerged under floodwaters.

[17] Record Outflows to Continue Through the Summer, International Lake Ontario-St. Lawrence River Board (July 8, 2019), *available at* https://ijc.org/en/loslrb/record-outflows-continue-through-summer (last visited November 7, 2019).

70. Several State agencies also incurred substantial expenses in connection with their responses to the flooding. As noted above, among other things, DEC and the New York National Guard fortified public and private shorefront property with water barriers and other equipment. The Division of Homeland Security and Emergency Services (DHSES) deployed sandbags, sandbagging machines, pumps and water barriers. DHSES also activated the State Emergency Operations Center for 125 days to conduct operations across eight New York Counties and hundreds of miles of shoreline. The Department of Transportation oversaw sandbag filling operations and activated its incident command system. In total, State agencies' response costs exceeded $38 million.

71. Additionally, the State has spent tens of millions of dollars helping homeowners, small businesses, municipalities, and others repair property damage from flooding in 2017 and 2019. These funds have been distributed through New York State Homes and Community Renewal in connection with the Lake Ontario-St. Lawrence Seaway Flood Relief and Recovery Grant Program, as well as (for flooding in 2017) through Empire State Development and the Lake Ontario Small Business Recovery Fund.

## FIRST CLAIM FOR RELIEF
**Negligence**

72. The State realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

73. The Boundary Waters Treaty, Plan 2014, the 2016 Supplementary Order of Approval, and other applicable law impose a duty on the IJC to operate the Dam in a manner that safeguards the interests of riparian property owners on the New York shores of Lake Ontario and meets a standard of reasonable care.

74. The IJC breached that duty of care by its actions and inactions, which were contrary to a reasonable standard of care. Among other things, the IJC decided not to and failed to release additional water through the Dam, chose to prioritize commercial shipping interests over riparian property owners, and failed to prioritize the interests of riparian property owners over commercial shipping interests.

75. As a foreseeable consequence and proximate result of the IJC's breach of its duty, flooding in 2017 and 2019 caused the State to incur substantial damages, including damage to the State's property; damages consisting of monies the State spent and will spend to mitigate or repair harms to its property and harms to municipalities, residents, and local businesses on the New York shores of Lake Ontario; and natural resource damages, including the value of lost recreational opportunities during the time State facilities were closed for repairs or were submerged under floodwaters.

76. The IJC is liable to the State for all such damages.

**SECOND CLAIM FOR RELIEF**
**Public Nuisance**

77. The State realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

78. The IJC failed to prevent and/or mitigate flooding in Lake Ontario in 2017 and 2019, thus causing widespread injuries and threatened injuries to the State and other riparian property owners on the New York shores of Lake Ontario.

79. Those injuries and threatened injuries constituted a public nuisance.

80. The IJC participated in the creation and/or maintenance of this public nuisance.

81. As a result of this public nuisance, the State incurred substantial damages, including damage to the State's property; damages consisting of monies the State spent and

will spend to mitigate or repair harms to its property and harms to municipalities, residents, and local businesses on the New York shores of Lake Ontario; and natural resource damages, including the value of lost recreational opportunities during the time State facilities were closed for repairs or were submerged under floodwaters.

82. The IJC is liable to the State for all such damages.

**THIRD CLAIM FOR RELIEF**
**Private Nuisance**

83. The State realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

84. The State and private parties own property on the shores of Lake Ontario.

85. During flooding in 2017 and 2019, the IJC failed to properly operate the Dam, thereby causing or allowing floodwaters in Lake Ontario to enter the State's property and property of private parties.

86. The IJC knew or should have known that its failure to properly operate the Dam was substantially certain to damage property along the shores of Lake Ontario and interfere with the right of property owners to use and enjoy that property.

87. The flooding did in fact substantially damage the State's property and property of private parties and unreasonably interfere with those property rights.

88. As a result of this private nuisance, the State incurred substantial damages, including damage to the State's property; damages consisting of monies the State spent and will spend to mitigate or repair harms to its property and harms to municipalities, residents, and local businesses on the New York shores of Lake Ontario; and natural resource damages, including the value of lost recreational opportunities during the time State facilities were closed for repairs or were submerged under floodwaters.

89. The IJC is liable to the State for all such damages.

**FOURTH CLAIM FOR RELIEF**
**Trespass**

90. The State realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

91. The State and private parties own property on the shores of Lake Ontario.

92. During flooding in 2017 and 2019, the IJC's actions and failures to act caused or allowed floodwaters in Lake Ontario to enter the State's property and property of private parties.

93. The entry of the floodwaters on the State's property and property of private parties was the immediate or inevitable consequence of the IJC's actions and failures to act.

94. The State and private parties did not authorize the IJC to cause or allow the floodwaters to enter their property, and the invasions were otherwise unjustified.

95. As a result of this trespass, the State incurred substantial damages, including damage to the State's property; damages consisting of monies the State spent and will spend to mitigate or repair harms to its property and harms to municipalities, residents, and local businesses on the New York shores of Lake Ontario; and natural resource damages, including the value of lost recreational opportunities during the time State facilities were closed for repairs or were submerged under floodwaters.

96. The IJC is liable to the State for all such damages.

**PRAYER FOR RELIEF**

WHEREFORE, the State requests judgment in its favor and against the IJC as follows:

a. Compensatory damages, in an amount to be proven at trial, consisting of damage to the State's property; damages consisting of monies the State spent and will spend to mitigate or repair harms to its property and harms to municipalities, residents, and local businesses on the New York shores of Lake Ontario; and natural resource damages, including the value of lost recreational opportunities during the time State facilities were closed for repairs or were submerged under floodwaters; and

b. Such other and further relief as this Court deems just and proper.

Dated: Rochester, New York
November 15, 2019

LETITIA JAMES
Attorney General
State of New York
Attorney for Plaintiffs

By: /s/ Ted O'Brien
Assistant Attorney General, of Counsel
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone: (585) 546-7430
Email: Ted.O'Brien@ag.ny.gov

/s/ Matthew J. Sinkman
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street
New York, New York 10005
Telephone: (212) 416-8446
Email: Matthew.Sinkman@ag.ny.gov