## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>                  Plaintiff,<br><br>       v.<br><br>INTERNATIONAL JOINT COMMISSION,<br><br>                  Defendant. | **Civil Action No. 6:20-cv-06091-EAW** |

## INTERNATIONAL JOINT COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

Respectfully submitted,

Attorneys for Defendant
*International Joint Commission*

BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W. Suite 700
Washington, DC 20005
Telephone: (202) 789-6000
deisenberg@bdlaw.com
jcruden@bdlaw.com
nhorewitch@bdlaw.com
hjacobs@bdlaw.com

PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, New York  14203-2887
Telephone: (716) 847-8400
khogan@phillipslytle.com

Daniel A. Eisenberg
John C. Cruden
Nessa Horewitch Coppinger
Hilary T. Jacobs
Kevin M. Hogan
– Of Counsel –

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iv

I.  INTRODUCTION .......................................................................................1

II.  BACKGROUND ........................................................................................2

    A.  The Boundary Waters Treaty Created and Guides the IJC. .........................2

    B.  Outflows at the Moses-Saunders Dam are Governed by Authorities Issued
       Pursuant to the Boundary Waters Treaty. ..................................................3

    C.  Procedural History......................................................................................5

III.  STANDARD OF REVIEW .........................................................................6

IV.  ARGUMENT ..............................................................................................7

    A.  Article III and 28 U.S.C. § 1331 Provide Federal Subject Matter
       Jurisdiction Over Treaties. ..........................................................................8

       1.  New York's Complaint Invokes Federal Questions by Claiming that
          the Boundary Waters Treaty Subjects IJC to a Duty of Care. .........8

       2.  The Boundary Waters Treaty is a Foundational "Ingredient" in
          Plaintiff's Claims. ........................................................................9

       3.  Federal Jurisdiction Exists in Accordance with the U.S. Supreme
          Court's *Grable* Test. ...................................................................10

          a.  Plaintiff's claims "necessarily raise" federal questions
             surrounding the meaning of the Boundary Waters Treaty. ...................11

          b.  The IJC's duty and potential liability under the Treaty are
             "actually disputed." ..................................................................12

          c.  This action raises substantial federal issues under a federal
             treaty, particularly with respect to foreign policy. ...............................13

          d.  A finding of federal jurisdiction will not disturb any
             congressionally approved balance of federal and state judicial
             responsibilities. .......................................................................16

          e.  New York misstates *Dreyfus*'s relevance to this case...........................17

    B.  The IJC Can Remove to Federal Court Because International Organizations
       Have the Same Removal Right as Foreign States and FSIA Raises a Federal
       Question. ...................................................................................................18

       1.  The IJC has a Statutory Right to Remove to Federal Court Under 28
          U.S.C. § 1441(d). .......................................................................18

       2.  The Supreme Court's Recent Immunity Decision Supports Federal
          Jurisdiction.................................................................................20

       3.  The Complaint Directly Raises Substantive Federal Law Issues Under
          FSIA...........................................................................................21

C.      This Court Also Has Jurisdiction Under Article III Based on Colorable
        Federal Defenses that the IJC Intends to Assert, Including the Political
        Question Defense. ................................................................................................24

V.      CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

## Federal Cases

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ................................................................ 23

*Baker v. Carr*,
    369 U.S. 186 (1962) ......................................................... 14, 24

*Barone v. Bausch & Lomb, Inc.*,
    372 F. Supp. 3d 141 (W.D.N.Y. 2019) ................................... 13

*Broder v. Cablevision Systems Corp.*,
    418 F. 3d 187 (2nd Cir. 2005) ........................................ 13, 16

*D'Alessio v. NYSE.*,
    258 F. 3d 93 (2d. Cir. 2001) ............................... 9, 10,11, 12

*DiLaura v. Power Auth. of State of N.Y.*,
    786 F. Supp. 241 (W.D.N.Y. 1991), *aff'd*, 982 F. 2d 73 (2d. Cir. 1992) .............. 14, 15, 24, 25

*Dreyfus v. Von Fink*,
    534 F.2d 24 (2d Cir. 1976) ................................................ 6, 17

*Erosion Victims of Lake Superior Regulation v. United States*,
    12 Cl. Ct. 68 (Cl. Ct. 1987) ................................................... 25

*Erosion Victims of Lake Superior Regulation v. United States*,
    833 F.2d 297, 300 (Fed.Cir.1987) ......................................... 14

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g, Mfg.*,
    545 U.S. 308 (2005) .................................................... passim

*Gunn v. Minton*,
    568 U.S. 251 (2013) ........................................... 10, 12, 13, 16

*Harraz v. EgyptAir Airlines Co.*,
    No. 18 CIV 12364(ER), 2019 WL 6700946 (S.D.N.Y. Dec. 9, 2019) ..................................... 6

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................................. 15

*In re Estate of Ferdinand E. Marcos Human Rights Litig.*,
    978 F.2d 493 (9th Cir. 1992) ................................................ 22

*In re Facebook, Inc., IPO Sec. and Derivative Litig.,*
    922 F. Supp. 2d 475 (S.D.N.Y. 2013) .................................................... 9, 11

*In re General Motors LLC Ignition Switch Litig.,*
    69 F. Supp. 3d 404 (S.D.N.Y. 2014) ........................................................... 6

*Int'l Refugee Org. v. Republic S.S. Corp.,*
    189 F.2d 858 (4th Cir. 1951) ................................................................ 9, 11

*Jam v. Int'l Finance Corp.,*
    --- U.S. ---, 139 S. Ct. 759 (2019) ..................................................... 20, 21

*Merrell Dow Pharm., Inc. v. Thompson,*
    478 U.S. 804 (1986) .................................................................................. 9

*Miller v. U.S,*
    583 F.2d 857 (6th Cir. 1978) ............................................................. 14, 15

*Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.,*
    435 F. 3d 127 (2d. Cir. 2006) .................................................................. 12

*Mizuna, Ltd. v. Crossland Fed. Sav. Bank,*
    90 F.3d 650 (2d Cir. 1996) ........................................................................ 6

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela,*
    863 F.3d 96 (2d Cir. 2017) ...................................................................... 23

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC,*
    770 F. 3d 1010 (2d. Cir. 2014) .................................................................. 9

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC,*
    957 F. Supp. 2d 388 (S.D.N.Y. 2013) ................................................. 11, 12

*New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.,*
    824 F. 3d 308 (2d. Cir. 2016) .................................................................. 16

*Osborn v. President, Directors & Co. of the Bank of the United States,*
    22 U.S. (9 Wheat.) 738 (1824) ......................................................... 7, 9, 24

*Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.,*
    760 F.2d 390 (2d Cir. 1985) .............................................................. 19, 20

*Robinson v. Gov't of Malaysia,*
    269 F.3d 133 (2d Cir. 2001) .............................................................. 22, 24

*Rodriguez v. Pan Am. Health Org.*,
  No. 18-CV-24995, 2020 WL 1666757 (S.D. Fla. Apr. 3, 2020) ........................................ 20, 21

*Salix Capital U.S. Inc. v. Banc of Am. Sec. LLC*,
  Nos. 13 Civ. 4018(NRB), 13 Civ. 7005(NRB), 13 Civ. 2297(NRB), 2013 WL
  6847064, (S.D.N.Y. Dec. 30, 2013) ........................................................................................ 19

*Sklarksi v. Niagara Falls Bridge Comm'n*,
  No. 09-cv-633A, 2010 WL 1257952 (W.D.N.Y. Mar. 26, 2010) ............................................ 12

*Soucheray v. Corps of Eng'r of U.S. Army*,
  483 F. Supp. 352 (W.D. Wis. 1979) .................................................................... 13, 14, 15, 25

*U.S. v. Belmont*,
  301 U.S. 324 (1937) ................................................................................................................ 15

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) ............................................................................................ 19, 21, 22, 23

*Walters v. Indus. and Commercial Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011) .................................................................................................... 24

*Whitaker v. Am. Telecasting, Inc.*,
  261 F. 3d 196 (2d. Cir. 2001) .................................................................................................... 6

**Federal Statutory Authorities**

22 U.S.C. § 288 .......................................................................................................................... 6, 18

22 U.S.C. § 288a(b) ..................................................................................................................... 5, 18

28 U.S.C. § 1331 ...................................................................................................................... passim

28 U.S.C. § 1391(f) .................................................................................................................... 20, 21

28 U.S.C. § 1391(f)(1) ...................................................................................................................... 19

28 U.S.C. § 1441 ............................................................................................................................... 6

28 U.S.C. § 1441(d) ............................................................................................................. 1, 18, 19

28 U.S.C. § 1446(a) ........................................................................................................................... 6

28 U.S.C. § 1605(a)(5) .................................................................................................................... 23

**Constitutional Provisions**

U.S. Const.art. III § 2 ......................................................................................................................... 9

## I.     INTRODUCTION

The State of New York has brought a federal case masquerading as a state tort claim. Every aspect of New York's Complaint, from its recitation of the acts that give rise to this lawsuit, to the legal theories supporting its causes of action, to its prayer for relief, is inextricably bound up in questions of federal law.  The target of the suit is the International Joint Commission ("IJC"), a bi-national organization formed by international treaty and funded by the federal governments of the United States and Canada that is entitled to the same privileges and immunities as a foreign sovereign.  New York's tort claims require a court to adjudicate whether the IJC properly executed its duties under that treaty, including whether the IJC appropriately balanced the interests of both Canadians and United States citizens who happen to live in New York.

While New York sought to have its claims heard in its own state courts, federal law dictates otherwise.  The IJC properly removed this case consistent with the Boundary Waters Treaty and the Foreign Sovereign Immunities Act ("FSIA").  Removal is proper under the Boundary Waters Treaty and Article III of the United States Constitution or 28 U.S.C. § 1331 because adjudication of New York's claims require interpretation of the Treaty, which raises substantial federal issues of law with significant ramifications for our federalist system of government and our foreign policy.  Removal is also proper under FSIA for two reasons: (1) foreign states, and by extension international organizations, have a unique statutory right to removal under 28 U.S.C. § 1441(d) and (2) actions implicating FSIA necessarily raise federal questions of law.

Accordingly, the IJC respectfully requests that New York's Motion for Remand be denied and this Court retain jurisdiction.

## II.     BACKGROUND

### A.     The Boundary Waters Treaty Created and Guides the IJC.

In 1909, the U.S. and Great Britain entered into the Boundary Waters Treaty at a time when Great Britain concluded international agreements on behalf of Canada.  The Treaty between the United States and Great Britain relating to boundary waters between United States and Canada, May 13, 1910, 36 Stat. 2448 ("Boundary Waters Treaty" or "Treaty").  *See also* IJC, Boundary Waters Treaty of 1909, https://www.ijc.org/en/boundary-waters-treaty-1909.  The Treaty was enacted to "prevent disputes regarding the use of boundary waters" between the United States and Canada and to "make provision for the adjustment and settlement" of questions regarding "the rights, obligations, or interests of either in relation to the other or to the inhabitants of the other, along their common frontier."  36 Stat. 2448*,* Preliminary Article.  In furtherance of these goals, the Treaty established the IJC, a bi-national, nonpolitical research, advisory, and mediation body for Canada and the United States, responsible for the approval and regulation of U.S. – Canadian boundary waters.[1]  *Id.* at 2449-2452, Articles III-IV, VII-VIII.  *See also* Congressional Research Service, The International Joint Commission (Aug. 30, 2019), https://crsreports.congress.gov/product/pdf/IF/IF10761.

Principles of bi-nationality permeate the IJC's structure and functions.  The IJC is composed of six members, or "Commissioners," three from each country; each country's heads of state (with input from other government officials) appoint its respective members.  36 State. 2451, Article VII; Congressional Research Service, International Joint Commission.  The two countries jointly fund the IJC's operations, with the United States providing funding through

---

[1] The Treaty defines "boundary waters" as "the waters from main shore to main shore of the lakes and rivers connecting waterways, or the portions thereof, along which the international boundary between the United States and . . . Canada passes, including all bays, arms, and inlets thereof."  36 Stat. 2448-2449, Preliminary Article.  The definition excludes tributary waters which naturally flow into or from "such lakes, rivers, and waterways" along the international border, and rivers flowing across the boundary.  *Id.*

annual Congressional appropriations.  *Id.* at 36 Stat. 2453-2454, Art. XII; IJC, <u>IJC Rules of Procedure</u>, No. 3, <u>https://ijc.org/en/who/mission/principles/rules-of-procedure</u>.

In making decisions and recommendations, the IJC must consider a wide range of affected interests on either side of the boundary.  *See, e.g.*, 36 Stat. 2451-2452, Article VIII (requiring the IJC to impose conditions in its approval in certain cases for suitable and adequate provisions on projects affecting boundary waters "for the protection and indemnity of all interests on the other side of the line which may be injured thereby").[2]  The Treaty also enables the IJC to address certain "questions or matters of difference" between the U.S. and Canada regarding "the rights, obligations, or interests" of either Country "in relation to each other or to their respective inhabitants."  36 Stat. 2452-2453, Articles IX, X.  Under the Treaty, no "uses, or obstructions or diversions . . . of boundary waters on either side of the line, affecting the natural level or flow of boundary waters on the other side of the line, shall be made except by authority of the United States or the Dominion of Canada within their respective jurisdictions, and with the approval of …the International Joint Commission."   36 Stat. 2449-2450, Article III.

> **B.      Outflows at the Moses-Saunders Dam are Governed by Authorities Issued Pursuant to the Boundary Waters Treaty.**

Pursuant to provisions of the Boundary Waters Treaty, on October 29, 1952, the IJC issued an Order of Approval approving of concurrent and complimentary applications filed by the Governments of Canada and the United States for the construction, operation, and maintenance of a cross-border hydropower project in the International Rapids Section of the St. Lawrence River.  IJC, *Order of Approval in the Matter of the Applications of the Government of Canada and the Government of the United States of America for an Order of Approval of the*

---

[2] The IJC's recommendations and decisions balance a wide range of affected interests and water uses, including drinking water, commercial shipping, hydroelectric power generation, agriculture, ecosystem health, industry, fishing, recreational boating and shoreline property.  IJC, <u>Role of the IJC</u>, <u>https://ijc.org/en/who/role</u>.

*Construction of Certain Works for Development of Power in the International Rapids Section of the St. Lawrence River* (Oct. 29, 1952) ("1952 Order of Approval").  Among other projects, the 1952 Order of Approval specifically granted Canada and the United States the authority to construct the Moses-Saunders Power Dam ("the Dam"), a cooperative project between the United States and Canada with the New York Power Authority ("NYPA") and Ontario Power Generation ("OPG") each owning and operating half of the plant's turbines.[3]  Pursuant to Article III of the Treaty, the 1952 Order of Approval imposed conditions on outflows at the dam, setting flow levels to "reduce flooding to shoreline communities, improve commercial shipping and generate electricity."  IJC, History of the IJC, https://www.ijc.org/en/who/history.

A 1956 Order of Approval governed outflows at the Dam from 1956 through 2016.  The IJC issued the Order, and the United States and Canada approved, in order to adjust outflows at the Dam in light of record flooding in the early 1950s.  IJC, *Plan* 2014 (June 2014), p. 8-10.  In response to increasing calls to reevaluate the 1956 Order of Approval's impacts on the environment, recreational opportunities, and riparian owners, the governments jointly funded an IJC study beginning in 2000.  *Id.* at p. 11.  The fourteen-year study culminated in the issuance of a new IJC Order of Approval on December 8, 2016, which allowed the IJC to adopt a new plan for regulating Dam outflows, such as *Plan* 2014.  IJC, *Supplemental Order of Approval in the Matter of the Regulation of the Level of Lake Ontario* (Dec. 8, 2016) ("2016 Order"); *see also* IJC, The Lake Ontario – St. Lawrence River *Plan* 2014 (June 2014) ("*Plan* 2014").  Both the United States and Canada concurred with the adoption of the 2016 Order and *Plan* 2014.[4]  In

---

[3] *See* NYPA, St. Lawrence-FDR Power Project, https://www.nypa.gov/power/generation/st-lawrence-fdr-power-project; OPG, Hydroelectric power – RH Saunders Generating Station, https://www.opg.com/powering-ontario/our-generation/hydro/; IJC, *Lake St. Lawrence*, https://ijc.org/en/loslrb/lake-st-lawrences.  In fact, the Dam is operated by Ontario Power Generation and New York Power Authority (NYPA).  Plaintiff has not clarified whether NYPA is an element of the State.

[4] IJC, *Letter from Martin Benjamin, Global Affairs Canada, and Francisco Palmieri, U.S. Department of State, to Comm'rs Gordon Walker and Lana Pollack, IJC* (Dec. 6, 2016) (concurring with *Plan* 2014).

addition to outlining new criteria for managing flows through the Dam, the 2016 Order also re-established an International Lake Ontario-St. Lawrence River Board, a bi-national body responsible for overseeing the regulation of water levels and flows at the Dam in accordance with the 2016 Order ("the Board"). *Id.*

Under *Plan* 2014, outflows at the Dam are generally dictated by a set of mechanistic release rules. IJC, *Plan* 2014 at 20-21, 58. If water levels reach extremely high or low elevations, however, the 2016 Order provides the Board with discretion to deviate from the flows specified by the rules in order to "provide all possible relief" to upstream and downstream riparian owners in the United States and in Canada. 2016 Order, Criterion H14, p. 9. The Board monitors water levels and directs Dam operators NYPA and OPG on how much water to release through the Dam in order to comply with the 2016 Order and *Plan* 2014.[5] IJC, *Directive to the International Lake Ontario - St. Lawrence River Board on Operational Adjustments, Deviations and Extreme Conditions*; IJC, Section 4: Regulation, https://ijc.org/en/loslrb/watershed/faq/4. This dispute concerns operation of the Dam during periods of unusually prolonged and severe precipitation resulting in extremely high water levels.

### C.    Procedural History.

On November 15, 2019, Plaintiff filed this action in the Supreme Court of the State of New York for the County of Monroe, Index No. E2019010865.[6] On February 10, 2020, the IJC removed this case to the United States District Court for the Western District of New York on the basis of the Boundary Waters Treaty, 36 Stat. 2448, the Foreign Sovereign Immunities Act,

---

[5] Contrary to Plaintiff's assertion, the IJC does not operate the Dam. *Cf.* Mem. of Law in Supp. of State of New York's Mot. to Remand this Action to State Ct., p. 1 ("This case concerns the negligent operation of the [Dam] by defendant the International Joint Commission").

[6] Plaintiff initially filed but did not serve a complaint in this action on October 9, 2019. Plaintiff's November 15, 2019 Complaint is a revised version of its October 9 complaint and was served on the IJC on January 8, 2020.

22 U.S.C. § 288a(b), the International Organizations Immunities Act, 22 U.S.C. § 288, *et seq.*,

and 28 U.S.C. § 1441.  These bases give rise to jurisdiction under both Article III and 28 U.S.C.

§ 1331.  On April 6, 2020, Plaintiff moved to remand this action to the Supreme Court of the

State of New York for the County of Monroe.

### III.    STANDARD OF REVIEW

Notices of removal need only contain "a short and plain statement of the grounds for

removal."  28 U.S.C. § 1446(a); *Whitaker v. Am. Telecasting, Inc.*, 261 F. 3d 196, 205 (2d. Cir.

2001).  When evaluating whether to retain jurisdiction, courts look to the jurisdictional facts

alleged in the notice of removal and to the arguments made in opposition to a motion to remand

expounding upon the basis for removal raised in the Notice.  *Harraz v. EgyptAir Airlines Co*.,

No. 18 CIV 12364 (ER), 2019 WL 6700946, at *3 (S.D.N.Y. Dec. 9, 2019).

District courts have "original jurisdiction over all civil actions arising under the

Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  For removal actions

based on section 1331, courts typically evaluate whether there is a basis for removal based on

plaintiff's complaint.  *In re General Motors LLC Ignition Switch Litig*., 69 F. Supp. 3d 404, 410

(S.D.N.Y. 2014).  Even if no federal cause of action is apparent, removal is still proper when

state law claims "turn on substantial questions of federal law."  *Grable & Sons Metal Prods., Inc.*

*v. Darue Eng'g, Mfg.*, 545 U.S. 308, 312 (2005).  For removal under federal schemes arising

under Article III of the Constitution, courts must evaluate whether the right to remove is "part of

a comprehensive scheme comprising both pure jurisdictional provisions and federal law" to

determine if the decision to vest courts with jurisdiction is consistent with the limitations in the

Constitution.  *Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 655–56 (2d Cir. 1996).

Contrary to Plaintiff's assertions, *Dreyfus v. Von Finck* does not provide the relevant standard

governing jurisdiction, and this court need not find that the Boundary Waters Treaty "prescribes

rules by which private rights may be determined" in order to find that it has jurisdiction to hear this dispute. *See infra* Section IV(A)(3)(e).

## IV.    ARGUMENT

The premise of this lawsuit alone proves that federal jurisdiction is proper. While Plaintiff strains to characterize its claims as arising under state law, virtually every paragraph of its Complaint implicates a substantial issue of federal law, whether under the Boundary Waters Treaty or the FSIA. The IJC also intends to assert several colorable federal defenses in this action,[7] including that this case presents a nonjusticiable political question. This Court thus has jurisdiction pursuant to both Article III of the United States Constitution and 28 U.S.C. § 1331.

New York's protestations that its claims "do not meaningfully implicate federal law" are belied by the allegations in its Complaint. All acts and injuries alleged in Plaintiff's Complaint plainly implicate the lawfulness of the IJC's conduct under a binational treaty and therefore belong in federal court. Plaintiff also specifically asserts in its negligence claim that the Treaty establishes a duty of care that the IJC has violated. Compl., ¶ 73 ("The Boundary Waters Treaty, *Plan* 2014, the 2016 Supplemental Order of Approval, and other applicable law impose a duty on the IJC to operate the Dam in a manner that safeguards the interests of riparian property owners on the New York shores of Lake Ontario and meets a standard of reasonable care.")

The IJC need only show that Plaintiff's Complaint generally implicates any "federal ingredient," or that the resolution of Plaintiff's claims hinge on a substantial issue of federal law. *See Osborn v. President, Directors & Co. of the Bank of the United States*, 22 U.S. (9 Wheat.) 738, 823 (1824) (Article III jurisdiction extends to cases involving any "federal ingredient");

---

[7] *See* Notice of Removal at ¶ 13.

*Grable,* 545 U.S. at 312 (state law cases which necessarily raise certain substantial federal issues can be heard in federal courts under 28 U.S.C. § 1331).[8]

Moreover, because the IJC is entitled to the same rights and privileges as a foreign state, the FSIA provides an independent basis for removal.

### A.     Article III and 28 U.S.C. § 1331 Provide Federal Subject Matter Jurisdiction Over Treaties.

Whether assessed under the broader jurisdictional standards of Article III of the U.S. Constitution or 28 U.S.C. § 1331, Plaintiff's Complaint sufficiently implicates the Boundary Waters Treaty to establish federal subject matter jurisdiction.

### 1.     New York's Complaint Invokes Federal Questions by Claiming that the Boundary Waters Treaty Subjects IJC to a Duty of Care.

Plaintiff's Complaint repeatedly asserts that the IJC failed to comply with duties defined by the Boundary Waters Treaty.  These allegations alone provide sufficient basis for federal jurisdiction under any test.  Specifically, Plaintiff's negligence cause of action alleges that the Treaty and orders adopted under the Treaty establish the standard of care applicable to the IJC in this matter.  Compl., ¶ 73 ("The Boundary Waters Treaty, *Plan* 2014, the 2016 Supplementary Order of Approval and other applicable law impose a duty on the IJC to operate the Dam in a manner that safeguards the interests of riparian property owners . . . .").  *See also, e.g., id.* at ¶ 1, 6 (alleging that the IJC failed to adhere to "its own mandated protocol for operation of [the Dam] during flooding"; that its claims arise from IJC's "failure to fulfill its . . . duty operate the Dam in a specific manner . . . .").

A plaintiff need not assert a federal cause of action to establish federal jurisdiction. *Grable*, 545 U.S. at 318 (the absence of a federal cause of action is not dispositive of federal

---

[8] The IJC identified the Boundary Waters Treaty as an independent source of authority for removal, which as explained herein, arises under either Article III or 28 U.S.C. § 1331 jurisdiction.  *See* Notice of Removal at ¶ 9.

jurisdiction).  Federal courts have jurisdiction over state law claims in which a plaintiff's "right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of Cal.  v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 13 (1983).  Further, the Second Circuit has found federal subject matter jurisdiction to exist where the "gravamen" of state law claims is that a party "failed to perform its statutory duty, created under federal law" such that resolution of the claims requires courts to interpret federal law.  *D'Alessio v. NYSE.*, 258 F. 3d 93, 101 (2d. Cir. 2001).  *See also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F. 3d 1010, 1020-21 (2d. Cir. 2014) (federal court had jurisdiction over state law claims alleging breach of a duty created by federal securities law); *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 922 F. Supp. 2d 475, 483-85 (S.D.N.Y. 2013) (same).  That is plainly the case here. Plaintiff's claim that the IJC violated its duties under the Boundary Waters Treaty requires analysis of federal questions concerning (a) the IJC's duties pursuant to the Treaty, and (b) whether the IJC breached those duties.

## 2.    The Boundary Waters Treaty is a Foundational "Ingredient" in Plaintiff's Claims.

Article III of the Constitution grants federal courts jurisdiction over all cases "arising under" treaties made by the United States.  U.S. Const. art. III § 2.  The Supreme Court of the United States has long recognized that any claims involving a federal "ingredient" fall within Article III's jurisdictional bounds.  *See Osborn,* 22 U.S. at 823*; Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 807 (1986).  Plaintiff's action – brought against an entity created by treaty and regarding activities undertaken in in furtherance of the Treaty's goals– contains multiple "federal ingredients."  *Osborn*, 22 U.S. at 823 (a federally created bank can "acquire no right, make no contract, bring no suit, which is not authorized by a law of the United States"); *Int'l Refugee Org. v. Republic S.S. Corp.*, 189 F.2d 858, 861 (4th Cir. 1951) ("If a corporation

may invoke the federal jurisdiction because created by a law of the United States, an international organization created by treaties to which the United States is a party may invoke the jurisdiction because created by a treaty of the United States.").  Further, Plaintiff's Complaint is grounded in allegations that the IJC's actions, all of which were undertaken under authority granted by the Treaty, caused its injuries.  Finally, any doubt that federal jurisdiction is proper should be dispelled by Plaintiff's assertion that IJC breached a duty of care established by the Treaty.  *See D'Alessio*, 258 F. 3d at 101.  These factors compel the conclusion that Article III jurisdiction is proper.

### 3. Federal Jurisdiction Exists in Accordance with the U.S. Supreme Court's *Grable* Test.

28 U.S.C. § 1331 grants federal courts jurisdiction over "all civil actions arising under the Constitution, laws or treaties of the United States, including certain state law claims that "turn on substantial questions of federal law."  *Grable,* 545 U.S. at 312.  Specifically, federal courts have jurisdiction over state law claims in which a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.  *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314).  Where all four of these elements are met, "jurisdiction is proper because there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum . . . ."  *Id.*  Plaintiff asks this court to remand its suit to state court without acknowledging let alone addressing the *Grable* standard, which governs the jurisdictional question in this case.  As explained below, Plaintiff's Complaint satisfies all four elements of *Grable*, and therefore was properly removed and should remain in federal court.

a.  **Plaintiff's claims "necessarily raise" federal questions surrounding the meaning of the Boundary Waters Treaty.**

Resolving Plaintiff's claims will require interpreting the duties, policies, and privileges established by Boundary Waters Treaty, as well as federal statutes governing immunity from suit (addressed in Section IV.B).  Claims that a party has breached a federally-defined duty "necessarily raise" a question of federal law.  *In re Facebook*, 922 F. Supp. 2d at 482-85 (alleged breach of duty established by federal securities law necessarily raised a federal issue); *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 957 F. Supp. 2d 388, 400 (S.D.N.Y. 2013) (same).  For instance, in *D'Alessio v. NYSE*, the Second Circuit held that although Plaintiff's claims were "cast as state law claims," their foundation in allegations that defendant had failed to enforce federal securities law "necessarily require[d]" construction of a federally created duty.  258 F. 3d at 102-104.  Additionally, federal questions are necessarily raised where the meaning of a federal law is an "essential element" of a state law claim.  *Grable*, 545 U.S. at 315.  Courts have also found an international organization's involvement in an action provides sufficient justification for federal jurisdiction.  *Int'l Refugee Org.*, 189 F. 2d at 861; *see also* Section IV.B, *infra*.

This is not a case "where a federal issue simply lingers in the background of a state law dominated complaint," but rather one where "virtually every paragraph in the complaint marks at least passing reference to some aspect of [federal law]".  *See New York City Health & Hosps. v. WellCare of New York, Inc.*, 769 F. Supp. 2d. 250, 257 (S.D.N.Y. 2011) (finding federal issues in a state law action "necessarily raised" under *Grable*).  Plaintiff protests that its claims are grounded exclusively in "New York common law," but its own pleadings -- which set out the integral role the Boundary Waters Treaty plays in this action and ground the IJC's purported

11

duty of care in the Treaty rather than state law -- tell a different story.[9]  By premising its state

law claims on allegations that the IJC has breached a duty of care established by the Treaty and

orders issued pursuant to the Treaty, New York has guaranteed that its claims will require

resolution of federal questions related to the interpretation of the Treaty.  *See D'Alessio*, 258 F.

3d at 103 ("resolution of [plaintiff's state law tort claims] necessarily requires an inquiry into

whether [defendant] satisfactorily performed its duty in identifying potential violations of federal

securities laws . . ."); *cf. Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*, 435 F. 3d 127, 135

(2d. Cir. 2006) (determination of an international organization's status as a state agency in state

law case will "inevitably require construction" of underlying American-Canadian agreement

establishing the organization).

    **b.**  **The IJC's duty and potential liability under the Treaty are "actually disputed."**

   A federal question is "actually disputed" where interpretation of a federal issue forms

"the central point of the dispute" between the parties.  *Gunn*, 568 U.S. at 259.  Differing

interpretations over any aspect of federal law, including the extent and application of a duty

created by federal law, can demonstrate an actual dispute.  *Id.* (disputing applicability of a

federal patent law provision to plaintiff's computer program); *NASDAQ*, 770 F. 3d at 1020-23

(state tort claims raised "disputed issue[]" of the extent of plaintiff's federal duty); *Sklarksi v.*

*Niagara Falls Bridge Comm'n*, No. 09-cv-633A, 2010 WL 1257952 (W.D.N.Y. Mar. 26, 2010)

---

[9] *Compare* Mem. of Law in Supp. of State of New York's Mot. to Remand this Action to State Ct., p. 1, ("These claims are based on New York common law and do not meaningfully implicate federal law"), 2 ("The IJC fails to point to any provision in the Boundary Waters Treaty that supplants New York common law . . ."), 3 ("the IJC failed to control the Dam in accordance with a reasonable standard of care"), and 8 ("While the State's claims relate to the IJC's control of water through the Dam, the standards that govern that control are supplied by New York Common law"), *with* Compl., ¶¶ 1 ("This action arises from the IJC's negligence and failure to adhere to its own mandated protocol . . ."), 6 ("The State's claims arise from IJC's failure to fulfill its non-discretionary duty to operate the Dam in a specified manner during periods of high water levels . . ."), 73 ("The Boundary Waters Treaty, *Plan* 2014, the 2016 Supplementary Order of Approval, and other applicable law impose a duty on the IJC . . .").

(meaning of federal joint resolution in question).  Here, Plaintiff and the IJC are demonstrably at odds on a number of federal questions, including the extent of the IJC's duties under the Boundary Waters Treaty and whether the IJC's actions taken pursuant to the Treaty caused Plaintiff's injuries.  The IJC asserts that its actions to regulate the outflows of water at the Dam at issue here were all undertaken consistent with and in fulfillment of its mandate under the Treaty.  *See Soucheray v. Corps of Eng'r of U.S. Army*, 483 F. Supp. 352, 355 (W.D. Wis. 1979) (the IJC's regulation of outflows on Lake Superior were actions taken under the IJC's authority under the Treaty).

### c. This action raises substantial federal issues under a federal treaty, particularly with respect to foreign policy.

Under *Grable*, the substantiality of a federal issue hinges on the "importance of the [federal] issue to the federal system as a whole" rather than its importance to the individual litigants.  *Gunn*, 568 U.S. at 260.  Courts have recognized substantial issues of federal law in actions that "involve aspects of a complex federal regulatory scheme."  *Broder v. Cablevision Systems Corp.*, 418 F. 3d 187, 195 (2nd Cir. 2005) (addressing alleged breach of federal regulation of cable television rates in breach of contract action).  *See also New York City Health & Hosps.*, 769 F. Supp. 2d at 257-58 (breach of contract action "implicates the complex reimbursement schemes created by Medicare law").  Cases challenging "any action taken by a federal agency or a coordinate branch of government," also often implicate substantial issues of federal law.  *Barone v. Bausch & Lomb, Inc.*, 372 F. Supp. 3d 141, 150-151 (W.D.N.Y. 2019) (collecting cases).

It is readily apparent from the Complaint that this case raises substantial questions of federal law related to interpretation of the Boundary Waters Treaty and the system the IJC has implemented under the Treaty.  Pursuant to the Treaty, the IJC has established a complex

13

regulatory scheme governing numerous transboundary water projects, which includes a mechanism for resolving disputes between Canada and the United States.  36 Stat. 2449-2452, Articles III-IV, VIII-IX.  By signing the Treaty, the U.S. agreed to confer jurisdiction of boundary waters to the IJC, effectively endorsing any regulatory scheme enacted by the IJC pursuant to the Treaty.  *DiLaura v. Power Auth. of State of N.Y.*, 786 F. Supp. 241, 250 (W.D.N.Y. 1991) (the United States "specifically assigned" regulation of U.S.-Canadian transboundary waters to the IJC through the Boundary Waters Treaty), *aff'd*, 982 F. 2d 73 (2d. Cir. 1992); *Erosion Victims of Lake Superior Regulation v. United States*, 833 F.2d 297, 300 (Fed.Cir.1987) ("[T]he United States agreed in the Boundary Waters Treaty that the IJC, not the United States, would have the final say over the use of boundary waters . . . ."); *Miller v. U.S*, 583 F.2d 857, 860 (6th Cir. 1978) ("[The IJC] has the authority to approve or prohibit and to regulate the obstruction or diversion of certain waters, and the United States and Canada agree not to allow construction of such projects without IJC approval."); *Soucheray*, 483 F. Supp. at 355  ("By signing the Treaty of 1909, the United States gave up any control over the diversion, obstruction and use of boundary waters [to the IJC].").  The decision to ratify the Treaty and vest this authority in the IJC was a federal decision by the United States.  Any litigation alleging that the IJC failed to take actions required by the Treaty or *Plan* 2014, and that it violated a duty of care found in the Treaty necessarily raises substantial federal questions.[10]

This action also has wide-reaching consequences for foundational principles of our federal system, which a federal court must necessarily address.  Matters of foreign policy – which a treaty inherently raises – have been vested exclusively to the federal government.  *Baker v. Carr*, 369 U.S. 186, 211 (1962).  Indeed, courts adjudicating disputes involving the IJC's

---

[10] *See* Compl., ¶¶ 2, 12, 13, 28, 34 (alleging that the IJC was "required" to take certain actions pursuant to the Treaty, the 2016 Order, or *Plan*  2014).

management of boundary waters have continually acknowledged that IJC's actions implicate foreign policy issues, and the potential ramifications that a judgment in these actions would have on foreign policy.  *See DiLaura*, 786 F. Supp. at 252 ("The regulation of flow of these boundary waters is a matter of foreign relations"); *Miller*, 583 F. 2d at 868  (dismissing tort claim alleging damages from operation of dam regulated by the IJC: "To the extent [plaintiffs] attack the decision of the United States to adhere to and carry out the directive of the IJC and its Board, their claim must be rejected.  Such a claim is closely intertwined with the conduct of the United States foreign policy by the legislative and executive branches of government an area [sic] in which courts are traditionally reluctant to interfere"); *Soucheray*, 483 F. Supp. at 356 ("Questions regarding the Commission's regulation of the boundary waters under the Treaty . . . contain issues of foreign policy relations, for which the Constitution gives Congress and the Executive primary responsibility").

The federal government has a constitutional right to enter into treaties on behalf of all states: states do not get to second-guess these decisions.  *See U.S. v. Belmont*, 301 U.S. 324, 332 (1937) ("In respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear.  As to such purposes the state of New  York does not exist."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference.").  However, that is exactly what New York is trying to do through this action.

Indeed, the Boundary Waters Treaty vests the IJC with jurisdiction over thousands of miles of boundary waters crossing through numerous states and provinces.  Were federal jurisdiction unavailable any time a state or private party brought suit, the IJC would be subject to local courts' varying interpretations of federal (Canadian *and* American) law, each potentially

15

influenced by concerns insular to a particular location.  This would not only undermine the IJC's

ability to carry out its duties under the Treaty, but would also thwart the federally-endorsed

purpose of entering the Treaty in the first place: to ensure a uniform and comprehensive

approach to management of boundary waters.  For these reasons, this dispute requires the neutral

and uniform application of federal law that only the federal court system can provide.  *See, e.g.,*

*Grable*, 545 U.S. at 312.

> ### d.   A finding of federal jurisdiction will not disturb any congressionally approved balance of federal and state judicial responsibilities.

The last *Grable* element considers whether federal jurisdiction would "disturb[] any

congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545

U.S. at 314.  In determining whether federal jurisdiction is appropriate, courts evaluate whether a

federal court would be best suited to interpret the particular federal question for purposes of

uniformity and/or Congressional interest.  *See, e.g., id.* at 315 (interpretation of federal tax law

belongs in federal court; weighing federal government's interest in the availability of a federal

forum for similar actions); *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F. 3d

308, 318 (2d. Cir. 2016) (the need for uniformity in interpreting federal securities law supports

federal jurisdiction).  Courts also consider whether federal jurisdiction over the type of claim at

issue would lead to a deluge of cases in federal courts that would "materially affect, or threaten

to affect, the normal currents of litigation."  *Grable*, 545 U.S. at 320.  *See also Gunn*, 568 U.S. at

258; *Broder*, 418 F. 3d at 196.

The foreign policy concerns this action presents create a strong national interest in

"claiming advantages thought to be inherent in a federal forum," which include federal courts'

experience sound judgment analyzing federal issues.  *Grable*, 545 U.S. at 314.  The foreign

policy ramifications of this case, as described in detail in Section IV.A.3.c, *supra,* are

underscored by the crucial fact that Canada is a party to the IJC and will be impacted by any outcome of this action.  This Court is best suited to adjudicate this matter with these federal foreign policy concerns in mind.

In addition, Congress already expressed a clear interest in how and where foreign states and international organizations like the IJC are subject to jurisdiction in American courts and determined that such actions belong in federal court.  *See* Section IV.B, *infra*, discussing the International Organizations Immunities and the Foreign Sovereign Immunities Acts.  This alone compels the conclusion that federal court is an appropriate forum for this action.

Finally, jurisdiction over this suit will not upset the federal-state court division of labor: the scope of the Treaty is narrow, creating few opportunities for litigation.  In the one-hundred-plus years since the Treaty's conclusion, cases in federal courts implicating the Treaty are rare.

### e.    New York misstates *Dreyfus*'s relevance to this case.

The State not only ignores the *Grable* standard that governs this jurisdictional dispute; it also invents its own standard for assessing federal jurisdiction out of whole cloth and pronounces it "well-settled."  The State cites to *Dreyfus v. Von Finck* for the proposition that "a treaty only provides jurisdiction under 28 U.S.C. § 1331 when the treaty 'prescribes rules by which private rights may be determined' and where federal question jurisdiction over such claims is 'provided for in the treaty.'"  534 F.2d 24, 30 (2d Cir. 1976), *cert. denied*, 429 U.S. 835 (1976).  Yet the standard set out and applied by the Second Circuit in *Dreyfus* is not a jurisdictional standard at all.  Rather, it is a standard for assessing whether a private plaintiff has rights under a treaty that are enforceable in federal court.[11]  Moreover, *Dreyfus* found that there *was* federal jurisdiction

---

[11] Indeed, virtually the entire line of cases cited by Plaintiff, like *Dreyfus*, concern whether a private cause of action exists under a Treaty that is enforceable in federal court, and are therefore inapplicable to this dispute concerning removal jurisdiction.

even just to determine whether there was or was not a private cause of action under the treaty. The same rationale supports federal jurisdiction here.

> **B.    The IJC Can Remove to Federal Court Because International Organizations Have the Same Removal Right as Foreign States and FSIA Raises a Federal Question.**

The IJC has the same statutorily granted rights as a foreign state.  Just as foreign states may remove actions filed in state court to federal court, so too may the IJC.  This right of removal illustrates Congress' determination that federal courts are an appropriate forum for the adjudication of claims implicating foreign states *and* international organizations.  Even absent this statutory right of removal, New York's Complaint raises federal questions under the FSIA because whether the IJC is immune from suit is a threshold issue that a court must resolve to establish subject matter jurisdiction.

Plaintiff has no basis to contest any of the above, so it does not attempt to do so.  Instead, New York's two-paragraph argument ignores the allegations in its own Complaint in an effort to characterize the IJC's removal notice as raising only a federal defense—a point that is both factually and legally incorrect.  Accordingly, New York's motion for remand should be denied.

> **1.    The IJC has a Statutory Right to Remove to Federal Court Under 28 U.S.C. § 1441(d).**

The IJC is an international organization under the International Organizations Immunities Act ("IOIA").  *See* 22 U.S.C. § 288; *see also* Complaint at ¶ 4 ("The IJC is an 'international organization' within the meaning of the International Organizations Immunities Act[.]").  The IOIA grants international organizations the "same immunity from suit and *every form of judicial process* as is enjoyed by foreign governments."  22 U.S.C. § 288a(b) (emphasis added).  That right includes the right to remove "any civil action brought in a State court against a foreign state

. . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(d).[12]

The FSIA is a comprehensive federal statute, which provides courts subject matter and personal jurisdiction over foreign states[13] in limited circumstances.[14]  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983) (FSIA "contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state[.]").  While FSIA does not prohibit state court actions, it does "ensure that any action that might be brought against a foreign sovereign in state court could also be brought in or removed to federal court."  *Id.* at 491 n. 16.  Through FSIA, "Congress deliberately sought to channel cases against foreign sovereigns away from state courts and into federal courts."  *Proyecfin*, 760 F.2d at 396 (*quoting Verlinden*, 461 U.S. at 497); *see also Salix Capital U.S. Inc. v. Banc of Am. Sec. LLC*, Nos. 13 Civ. 4018(NRB), 13 Civ. 7005(NRB), 13 Civ. 2297(NRB), 2013 WL 6847064, at *10 (S.D.N.Y. Dec. 30, 2013) ("FSIA expresses an intention to give sovereign foreign defendants an *absolute right* to a federal forum.") (denying motion for remand) (italics in original; internal citations removed).  Plaintiff's argument that Congress has not provided original jurisdiction in federal court for the IJC misses the point.[15]  Whether Congress gave the IJC original jurisdiction in federal court is irrelevant to whether the IJC has a right to be in federal court if it so wishes pursuant to the IOIA and FSIA.  The legislative history for FSIA shows that Congress intended to create a broad right of removal to federal courts because "of the potential sensitivity of actions

---

[12] Removing to the Western District of New York is appropriate under 28 U.S.C. § 1391(f)(1), which identifies the appropriate venues for litigation involving a foreign state, because the physical shoreline that New York alleges has been harmed by the IJC's actions is located within this judicial district.

[13] Section 1441(d) incorporates the definition of a "foreign state" under FSIA.  "As part of the overall statutory scheme [of FSIA], Congress amended the removal statute … to include a provision enabling a foreign state to remove."  *Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.*, 760 F.2d 390, 396 (2d Cir. 1985)

[14] By opposing the State of New York's Motion for Remand, the IJC does not waive its immunity or in any way consent to the jurisdiction of any court. The IJC reserves its right to defend this action on the basis of its immunity.

[15] *See* Motion for Remand at 8.

against foreign states and the importance of developing a uniform body of law in this area[.]"
*Proyecfin*, 760 F.2d at 397 *citing* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, reprinted in 1976
U.S.Code Cong. & Ad.News 6604, 6617.

### 2. The Supreme Court's Recent Immunity Decision Supports Federal Jurisdiction.

International organizations enjoy the same protections that foreign states enjoy under
FSIA. *Jam v. Int'l Finance Corp.*, --- U.S. ---, 139 S. Ct. 759, 772 (2019). In *Jam*, the Supreme
Court interpreted section 288a(b) of the IOIA and held that the IOIA "grants international
organizations the 'same immunity' from suit 'as is enjoyed by foreign governments' [… and]
[t]oday, that means that the FSIA governs the immunity of international organizations."

In the short time since the *Jam* ruling, a federal district has relied on that decision to find
that procedural rules applicable to foreign states, such as specific venue restrictions apply equally
to international organizations because section 288a(b) of the IOIA provides for the "same …
judicial process as is enjoyed by foreign governments." *See Rodriguez v. Pan Am. Health Org.*,
18-CV-24995, 2020 WL 1666757, at *8 (S.D. Fla. Apr. 3, 2020). In *Rodriguez*, the Pan
American Health Organization, an international organization, filed a motion to transfer venue,
arguing that the venue restrictions within FSIA (which are codified at 28 U.S.C. § 1391(f)),
extended to international organizations as part of their congressionally-afforded immunity from
suit. The court agreed based on section 288a(b)'s guarantee of equivalent protections for
international organizations as foreign states and *Jam*.

> The FSIA limits both the substantive waivers of foreign sovereign immunity
> ("whether" the foreign state can be sued) and the venues proper for suit ("where"
> the foreign state can be sued), because both "whether" and "where" are features of
> foreign sovereign immunity. And as foreign sovereign immunity extends in its
> entirety to international organizations, international organization immunity must
> necessarily encompass Section 1391(f)'s venue restrictions.

*Id.* at *8 *citing Jam*, 139 S. Ct. at 769 (other internal citations removed).  Indeed, extending identical venue limitations to international organizations "aligns with the congressionally-determined policy that foreign sovereign immunity exists to protect foreign states from suit except in defined forums and circumstances."  *Id.* at *9.  *Rodriguez* makes clear that procedural protections in place for foreign states are equally applicable to international organizations.

International organizations enjoy the same right as foreign states to remove cases implicating the FSIA from state to federal court.  Section 288a(b) of the IOIA specifically provides that international organizations shall enjoy the same "judicial process as is enjoyed by foreign governments."  Consistent with the text of the IOIA, *Jam*, and *Rodriguez*, the IJC has the same right to remove this case to federal court under section 1441(d) as a foreign state.  For this reason alone, removal to this Court is proper.

> ### 3.    The Complaint Directly Raises Substantive Federal Law Issues Under FSIA.

The Supreme Court has unambiguously concluded that cases implicating FSIA raise issues of federal law and confer jurisdiction on federal courts: "a suit against a foreign state under [FSIA] necessarily raises questions of substantive federal law at the very outset, and hence clearly "arises under" federal law, as that term is used in Article III."  *Verlinden*, 461 U.S. at 493.[16]  New York's Complaint raises substantive issues under FSIA that confer federal jurisdiction on this Court.  *See id*; *see also Jam*, 139 S. Ct. at 772 ("the Foreign Sovereign Immunities Act governs the immunity of international organizations.").

Because a determination of immunity is a question of federal law, New York is left to argue that the question of immunity arises only as an anticipated defense rather than in the

---

[16] The IJC identified FSIA as an independent source of authority for removal, which as explained herein, arises under Article III jurisdiction.  *See* Notice of Removal at ¶ 11.

Complaint itself, thereby contending that the so-called "well-pleaded complaint" rule precludes federal jurisdiction.[17]  This argument is misplaced for two reasons.  First, the well-pleaded complaint rule is inapplicable to Article III "arising under" jurisdiction.  The rule applies only to statutory "arising under" jurisdiction.  Second, New York's Complaint *does* raise a federal question.  Determining immunity is a substantive federal law issue.  Finally, immunity is also an affirmative defense that the IJC will raise, which is sufficient to confer federal jurisdiction.

First, because FSIA implicates Article III "arising under" jurisdiction, the well-pleaded compliant rule is inapplicable. *Verlinden,* 461 U.S. at 494-95  (concluding that the requirement that "the federal question must appear on the face of a well-pleaded complaint and may not enter in anticipation of a defense" only applies "for purposes of *statutory* 'arising under' jurisdiction," rather than Article III jurisdiction, which is broader.)  Through FSIA and the IOIA, Congress conferred jurisdiction on federal courts for claims against foreign states and international organizations, and "the resulting jurisdictional grant is within the bounds of Article III, since every action against a foreign sovereign necessarily involves application of a body of substantive federal law, and accordingly, 'arises under' federal law, within the meaning of Article III."  *Id.* at 497; *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 139 (2d Cir. 2001) (citing *Verlinden* and recognizing that FSIA confers Article III "arising under" federal jurisdiction); *In re Estate of Ferdinand E. Marcos Human Rights Litig*., 978 F.2d 493, 502 (9th Cir. 1992) (same).

Second, even if the well-pleaded complaint rule applied, New York has affirmatively raised an issue of federal law.  This court need only look to New York's Complaint itself, which concedes that the State can only proceed with its claims upon a finding that the IJC's actions fall

---

[17] Under the well-pleaded complaint rule, the federal question of law must arise in the complaint itself and not solely as an anticipated defense.  *Whitehurst v. 1199 SEIU United Healthcare Workers East*, 928 F.3d 201, 206 (2d Cir. 2019).

within an exception to the immunity generally conferred on the IJC by the IOIA through FSIA.

Specifically, in the Amended Complaint, New York alleges:

- "Section 1605(a)(5) of the FSIA provides an exception to sovereign immunity for [*sic*] in any case "in which money damages are sought against a foreign state for . . . damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." Complaint ¶ 5.

- "The FSIA protects international organizations from claims based on the exercise or performance of a 'discretionary function.'  *See* 28 U.S.C. § 1605(a)(5)(A).  The State's claims in this case are not based on IJC's exercise or performance of a discretionary function.  Rather, the State's claims arise from IJC's failure to fulfill its non-discretionary duty to operate the Dam in a specified manner during periods of extremely high water levels in Lake Ontario and in accordance with the standard of reasonable care required by law."  Complaint ¶ 6.

New York's effort to recast the IJC's immunity as nothing more than an affirmative defense is belied by the plain language of its own Complaint, which recognizes the centrality of the question of immunity under federal law.[18]  A court *must* adjudicate whether the IJC's actions were a "discretionary function" (28 U.S.C. § 1605(a)(5)) under FSIA in order to determine whether the IJC is immune from suit because FSIA is the sole basis for jurisdiction over foreign states, and by extension, international organizations.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989); *see also Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 103-04 (2d Cir. 2017) (providing detailed history of FSIA and explaining that FSIA would be applied to "every civil action against a foreign state").  "[S]ubject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, [so] even if a foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act."

---

[18] Motion for Remand at 8-9.

*Verlinden*, 461 U.S. at 493 n. 20.[19]  Here too, the IJC's immunity under the IOIA and FSIA is not

only an anticipated affirmative defense; it is a federal question that must be resolved to

determine whether this court—or any court—has subject matter jurisdiction.

Finally, even if FSIA is only raised as an anticipated defense, that is still sufficient for

federal jurisdiction.  As explained above, the well-pleaded complaint rule is not a limitation on

Article III jurisdiction, so the fact that the IJC intends to raise its immunity from suit under FSIA

as a defense is sufficient for this litigation to be in federal court.  *See* § 3562 "The Meaning of

"Arising Under", 13D Fed. Prac. & Proc. Juris. § 3562 (3d ed.) (explaining that the well-pleaded

complaint rule is a limitation on statutory "arising under" jurisdiction).

### C.     This Court Also Has Jurisdiction Under Article III Based on Colorable Federal Defenses that the IJC Intends to Assert, Including the Political Question Defense.

Article III jurisdiction can be premised on the assertion of a colorable federal defense.

*Osborn*, 22 U.S. at 822.  As noted in the IJC's Notice of Removal, the IJC also intends to assert

other colorable federal defenses that arise under this claim, including but not limited to the

political question defense.[20]  Notice of Removal at ¶ 13.

Courts often hold that questions of foreign relations, for which the Constitution gives

Congress and the Executive primary responsibility, are not justiciable.  *Baker,* 369 U.S. at 211-

213.  Because actions taken by the IJC pursuant to the Treaty inevitably implicate questions of

---

[19] *See also Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 287 (2d Cir. 2011) (recognizing that although FSIA's legislative history "suggests that jurisdictional immunity is an affirmative defense […] subject matter jurisdiction turns on the existence of an exception to foreign sovereign" so courts must evaluate immunity, whether it is raised or not, because courts have an independent obligation to determine the presence of subject matter jurisdiction); *Robinson*, 269 F.3d at 139  ("Under the FSIA, federal courts therefore inquire at the 'threshold of every action' against a foreign state whether the exception to sovereign immunity that the plaintiff alleges permits the exercise of federal jurisdiction.").

[20] By removing to federal court, the IJC does not admit that this claim is ultimately justiciable.  Rather, the IJC has a right to remove to federal court to determine this action's justiciability.  *See, e.g., DiLaura* (determining that IJC's regulation and management of the boundary waters is a nonjusticiable political question).

foreign relations, judicial resolution of the propriety of those actions is inappropriate.  Federal courts have consistently held that the IJC's regulation and management of international boundary waters presents a nonjusticiable political question.  *DiLaura*, 786 F. Supp. at 250 ("an injunction compelling PASNY to exert unilateral control over diversions from the River would infringe the jurisdiction of the IJC as established by the 1909 Treaty"); *Soucheray*, 483 F. Supp. 356 ("questions regarding the Commission's regulations of boundary waters . . . contain issues of foreign relations, for which the Constitution gives Congress and the Executive primary responsibility").  *See also Erosion Victims of Lake Superior Regulation v. United States*, 12 Cl. Ct. 68, 72 (Cl. Ct. 1987) (alleged damages stemming from operation of a dam regulated by the IJC "are best addressed by Congress, an entity better situated to weigh competing private, international, and state interests, and to undertake a more comprehensive remunerative and regulatory scheme in conjunction with Canada and the IJC.")

## V.     CONCLUSION

For all of the reasons above, the IJC respectfully requests that this Court deny Plaintiff's Motion to Remand this case.

Dated:          April 27, 2020                          Respectfully submitted,

                                                         */s/ Daniel A. Eisenberg*
                                                         Daniel A. Eisenberg (admission pending)
                                                         John C. Cruden (admitted *pro hac vice*)
                                                         Nessa Horewitch Coppinger (*pro hac vice* admission forthcoming)
                                                         Hilary T. Jacobs (admitted *pro hac vice*)
                                                         BEVERIDGE & DIAMOND, P.C.
                                                         1350 I Street, N.W., Suite 700
                                                         Washington, D.C. 20005
                                                         Telephone (202) 789-6000
                                                         deisenberg@bdlaw.com

                                                         -and-

25

<u>/s/ Kevin M. Hogan</u>
Kevin M. Hogan
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, New York 14203
Telephone (716) 847-8400
khogan@phillipslytle.com

Attorneys for Defendant
*International Joint Commission*

26