UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STATE OF NEW YORK,

             Plaintiff,

       v.

INTERNATIONAL JOINT COMMISSION,

             Defendant.
_____

**DECISION AND ORDER**

6:20-cv-06091-EAW

## I.   INTRODUCTION

The above-captioned matter was commenced by plaintiff the State of New York ("the State") in New York State court. Defendant the International Joint Commission ("the IJC") removed the case to federal court on the basis of federal question jurisdiction. (Dkt. 1). The State has filed a motion to remand. (Dkt. 10). For the reasons discussed below, the Court denies the motion to remand because it finds that this is one of those rare cases where the state law claims asserted in the complaint necessarily raise a federal issue which is actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance approved by Congress. However, because this Decision and Order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and "an immediate appeal from" this Decision and Order would potentially "materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), the Court will permit the State to seek an interlocutory appeal.

## II.     BACKGROUND

The State filed this action against the IJC in New York State Supreme Court, Monroe County, on November 15, 2019.  (Dkt. 1 at ¶ 1).  The IJC is a "binational U.S.-Canadian entity created by the U.S.-Great Britain Boundary Waters Treaty of 1909 (the Boundary Waters Treaty), 36 Stat. 2448," and "is responsible for controlling the flow of water from Lake Ontario down the St. Lawrence River by directing the operation" of the Moses-Saunders Power Dam (the "Dam"), through which the border between Canada and the United States runs.  (Dkt. 1-4 at ¶¶ 1, 4).  The complaint seeks damages caused by "serious flooding on the south shores of Lake Ontario" in 2017 and 2019.  (*Id*. at ¶ 2).  The State alleges that the flooding was caused by the IJC's failure to implement its flood relief protocol which required the IJC to increase outflows through the Dam.  (*Id*.).  The State further alleges that implementation of the flood relief protocol is a non-discretionary duty on the part of the IJC, as to how it is supposed to operate the Dam during periods of extremely high water levels in Lake Ontario.  (*Id*. at ¶ 6).  The State asserts four causes of action against the IJC: (1) negligence; (2) public nuisance; (3) private nuisance; and (4) trespass.  (*Id*. at ¶¶ 72-96).

On February 20, 2020, the IJC removed the action based on federal question jurisdiction under 28 U.S.C. § 1331, citing two theories of federal jurisdiction: (1) the Boundary Waters Treaty, 36 Stat. 2448; and (2) the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 ("FSIA"), and the International Organizations Immunities Act, 22 U.S.C. § 288a(b).  (Dkt. 1 at ¶ 2).  On April 6, 2020, the State filed the instant motion to remand the matter to state court.  (Dkt. 10).  The State argues that the Boundary Waters Treaty does

not give rise to federal jurisdiction and that, under the well-pleaded complaint rule, the fact that the IJC will assert federal defenses under the FSIA to the claims in this action under the FSIA does not give rise to federal jurisdiction. (Dkt. 10-1).

The IJC filed a memorandum in opposition to the motion to remand on April 27, 2020 (Dkt. 11), and the State filed a reply memorandum on May 11, 2020 (Dkt. 13). Oral argument was held before the undersigned on January 21, 2021 (Dkt. 19), at which time the Court reserved decision.

### III. DISCUSSION

#### A. General Principles of Removal

Pursuant to 28 U.S.C. § 1447(c), federal courts may remand a case "on the basis of any defect in removal procedure" or because "the district court lacks subject matter jurisdiction." *LaFarge Coppee v. Venezolana De Cementos, S.A.C.A.*, 31 F.3d 70, 72 (2d Cir. 1994) (citation omitted). "In a case removed to federal court from state court, the removal statute is to be interpreted narrowly, and the burden is on the removing party to show that subject matter jurisdiction exists and that removal was timely and proper." *Winter v. Novartis Pharm. Corp.*, 39 F. Supp. 3d 348, 350 (E.D.N.Y. 2014) (citing *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994)); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." (citations omitted)). In other words, "[o]n a motion to remand, the

party seeking to sustain the removal, not the party seeking remand, bears the burden of demonstrating that removal was proper." *Hodges v. Demchuk*, 866 F. Supp. 730, 732 (S.D.N.Y. 1994) (citing *R.G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, 655 (2d Cir. 1979) ("[T]he burden falls squarely upon the removing party to establish its right to a federal forum by competent proof." (quotation omitted) (abrogated on other grounds by *Hertz Corp. v. Friend*, 559 U.S. 77 (2010))); *see also Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006) ("It is well-settled that the party asserting federal jurisdiction bears the burden of establishing jurisdiction."). Moreover, "the party seeking remand is presumed to be entitled to it unless the removing party can demonstrate otherwise," *Bellido-Sullivan v. Am. Int'l Grp., Inc.*, 123 F. Supp. 2d 161, 163 (S.D.N.Y. 2000), and "[a]ny doubts as to removability should be resolved in favor of remand," *Payne v. Overhead Door Corp.*, 172 F. Supp. 2d 475, 477 (S.D.N.Y. 2001). Thus, in this case, the IJC bears the burden to establish that the case should remain in federal court, the State is presumed to be entitled to remand unless the IJC can establish otherwise, and any doubts should be resolved in favor of remand. It is a heavy burden that the IJC faces to maintain this action in federal court. Nonetheless, for the reasons set forth below, the Court concludes that the IJC has met that burden and the case should remain in federal court.

B.  General Principles of Federal Question Jurisdiction

"One category of cases over which the district courts have original jurisdiction are 'federal question' cases; that is, those cases 'arising under the Constitution, laws, or treaties of the United States.'" *Metro. Life Ins. v. Taylor*, 481 U.S. 58, 63 (1987) (citing 28 U.S.C. § 1331). In determining whether removal based upon federal question jurisdiction is

proper, the "well-pleaded complaint rule," which requires a court to consider only allegations in the complaint and not matters raised by the defendant in defense, generally applies. *Franchise Tax Bd. of the State of Cal v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 9-10 (1983); *see also Beneficial Nat Bank v. Anderson*, 539 U.S. 1, 6 (2003) ("[A] defense that relies on . . . the pre-emptive effect of a federal statute[ ] will not provide a basis for removal." (citations omitted)); *see generally Metro. Life*, 481 U.S. at 63 ("The 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts."). "The well-pleaded-complaint rule confines the search for a basis of federal question jurisdiction to 'what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may impose.'" *Lupo*, 28 F.3d at 272 (quoting *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914)). To render remand inappropriate, it is sufficient for a court to have federal question jurisdiction over one of the claims at issue in this litigation. *The NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1020 (2d Cir. 2014).

These general principles notwithstanding, "[t]hree situations exist in which a complaint that does not allege a federal cause of action may nonetheless 'aris[e] under' federal law for purposes of subject matter jurisdiction." *Fracasse v. People's United Bank*, 747 F.3d 141, 144 (2d Cir. 2014). Those situations may occur where "Congress expressly provides, by statute, for removal of state law claims," when "the state law claims are completely preempted by federal law," or "in certain cases if the vindication of a state law right necessarily turns on a question of federal law." *Id*. It is the third principle that is at

issue here, which courts have termed the "substantial federal question doctrine." *See Amcat Glob., Inc. v. Yonaty*, 192 F. Supp. 3d 308, 312 (N.D.N.Y. 2016); *In re Standard & Poor's Rating Agency Litig.*, 23 F. Supp. 3d 378, 393 (S.D.N.Y. 2014); *see also Veneruso v. Mount Vernon Neighborhood Health Ctr.*, 933 F. Supp. 2d 613, 619 (S.D.N.Y. 2013) (describing the "substantial federal question doctrine" as a "limited exception[ ] to the well-pleaded complaint rule"), *aff'd*, 586 F. App'x 604 (2d Cir. 2014). "Federal jurisdiction in these circumstances is predicated on 'the presence of a federal issue in a state-created cause of action.'" *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 99 (2d Cir. 2001). This category of federal jurisdiction cases, "which dates back 'nearly 100 years' in Supreme Court precedent, is rooted in 'the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues.'" *The NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1019 (2d Cir. 2014).

  C.  The *Gunn-Grable* Test for the Substantial Federal Question Doctrine

  The Supreme Court has recognized that the "vast bulk of suits that arise under federal law" involve instances where "federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). Nonetheless, "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). However, "[i]t is well-settled that only a 'special and small' category of cases that allege a state-law claim meet the test for arising under federal law pursuant to 28 U.S.C. § 1331." *Martelli*

*v. Niagara Falls Bridge Comrn'n*, No. 13-CV-652-A, 2013 WL 3761550, at *2 (W.D.N.Y. July 16, 2013) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)); *see NASDAQ OMX Grp.,*, 770 F.3d at 1019 ("[T]he Supreme Court has been sparing in recognizing state law claims fitting this criterion."). "[D]elineating the parameters of federal jurisdiction in such circumstances has presented a constant challenge," and courts must exercise "caution in identifying the narrow category of state claims over which federal jurisdiction may be exercised." *NASDAQ OMX Group Inc.*, 770 F.3d at 1020. Nonetheless, federal courts have "the duty to exercise jurisdiction when they identify state claims falling within that limited sphere." *Id*.

"To aid courts in identifying the 'extremely rare exceptions' comprising this group, the Supreme Court has fastened a four-part test." *Mihok v. Medtronic, Inc.*, 119 F. Supp. 3d 22, 27 (D. Conn. 2015) (quoting *Gunn*, 568 U.S. at 257). "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. "All four requirements must be satisfied in order for a federal court to have jurisdiction." *Varga v. McGraw Hill Fin., Inc.*, 36 F. Supp. 3d 377, 381 (S.D.N.Y. 2014) (citing *Gunn*, 568 U.S. at 258). The Court addresses each aspect of the test in the context of this case below, and concludes that all four parts are satisfied here.

    1.    <u>Necessarily Raised</u>

"A state-law claim 'necessarily' raises federal questions where the claim is affirmatively 'premised' on a violation of federal law." *State of New York ex rel. Jacobson*

- 7 -

*v. Wells Fargo National Bank*, 824 F.3d 308, 315 (2d Cir. 2016).  Thus, for instance, if state law claims are asserted based on a duty arising under federal law, a state-law claim necessarily raises a federal question.  *See NASDAQ OMX Group, Inc.*, 770 F.3d at 1021 (where the duty underlying state law claims was derived from federal law, the first element of the *Gunn-Grable* test was satisfied).

The State alleges that the IJC was created by the Boundary Waters Treaty and that it failed to fulfill its alleged non-discretionary duty to operate the Dam in a specified manner during periods of extremely high water levels in Lake Ontario.  (Dkt. 1-4 at ¶¶ 1, 4).  According to the complaint, both the United States and Canadian governments approved the IJC's request to study and review its regulations governing outflows of waters from Lake Ontario through the Dam, ultimately culminating in "Plan 2014" which was adopted by the IJC in 2016 with the consent of the United States and Canada, and sets parameters for regulating the outflow of water through the Dam.  (Dkt. 1-4 at ¶¶ 10, 23-25, 29).  The complaint further alleges that in adopting Plan 2014, in December 2016, the IJC issued a Supplementary Order of Approval, which provides that:

> [i]n accordance with Article VIII of the [Boundary Waters] Treaty, interests on either side of the International Boundary which are injured by reason of the construction, maintenance and operation of the [Dam] shall be given suitable and adequate protection and indemnity as provided by the laws of Canada, or the Constitution and laws in the United States respectively.

(Dkt. 1-4 at ¶ 30).  According to the complaint, during periods of "extremely high levels" of water in Lake Ontario, "Plan 2014 requires that the Dam '*shall* be operated to provide *all possible relief to the riparian owners* [i.e., owners of shoreline real property] upstream and downstream.'"  (Dkt. 1-4 at ¶ 12).  But in the event of "extremely low levels" of water,

"Plan 2014 provides that the Dam 'shall be operated to provide all possible relief to municipal water intakes, navigation [i.e., commercial shipping] and power purposes, upstream and downstream." (*Id.*). According to the State, during the flooding events of 2017 and 2019, the IJC failed to comply with Plan 2014, instead prioritizing commercial shipping interests during the high levels of water in Lake Ontario as opposed to providing all possible relief to riparian owners along Lake Ontario who were upstream from the Dam. (Dkt. 1-4 at ¶¶ 13, 66, 74). The State alleges that the IJC was negligent in its operation of the Dam during these flooding events, based on a duty imposed by "[t]he Boundary Waters Treaty, Plan 2014, the 2016 Supplementary Order of Approval, and other applicable law." (Dkt. 1-4 at ¶ 73).

These allegations satisfy the first part of the *Gunn-Grable* test. The State has expressly alleged that the IJC's duty arose pursuant to the Boundary Waters Treaty and the IJC's regulations adopted with the consent of the United States and Canada. In other words, the issue of whether the IJC owed a duty to the State and breached that duty necessarily turns on the interpretation of federal issues. In its motion papers, the State attempts to distance itself from the allegations in its complaint (*see*, *e.g.*, Dkt. 13 at 12 ("the Treaty does not create any duties that bind the IJC—its duty of care is supplied by New York common law")), but the complaint speaks for itself. Having alleged that the duty purportedly owed by the IJC arose under the Boundary Waters Treaty and IJC regulations, the State cannot now disclaim its express allegations that necessarily raise federal questions.

2. Actually Disputed

"[T]he 'actually disputed' factor of the test is satisfied when the federal issue is 'the only' or 'the central' point in dispute." *Jacobson*, 824 F.3d at 316. Again, where the duty at issue is rooted in federal law and the dispute focuses on whether that duty has been violated, the federal issue is appropriately considered actually disputed. *NASDAQ OMX Group, Inc.*, 770 F.3d at 1021 ("Thus, whether a registered securities exchange such as NASDAQ has violated its federally prescribed duty to operate a fair and orderly exchange necessarily raises a disputed question of federal law."); *see Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195 (2d Cir. 2005) (determining that the federal issue was "actually disputed" where the parties disputed whether a federal statute had been violated).

Thus, although the State's "claims for relief may invoke state law of . . . tort, the duty on which these claims turn . . . necessarily raises disputed issues of federal . . . law." *NASDAQ OMX Group, Inc.*, 770 F.3d at 1022. The premise of the State's claims against the IJC is that the IJC took actions in contravention of a non-discretionary duty imposed by the Boundary Waters Treaty and IJC regulations adopted with the express consent of the United States and Canada. As a result, resolving whether the IJC breached that alleged duty manifestly involves a federal issue that is actually disputed.

3. Substantial

"[I]n order to satisfy the *Grable-Gunn* 'substantial' federal issue requirement, *i.e.*, to present a legal issue that implicates 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum, 'it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will always be true when the

state claim 'necessarily raise[s]' a disputed federal issue. . . . The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole." *Jacobson*, 824 F.3d at 316 (quoting *Grable*, 545 U.S. at 313, and *Gunn*, 133 S. Ct. at 1066); *see also NASDAQ OMX Group, Inc.*, 770 F.3d at 1024 ("We here conclude that the disputed federal issue in this case—whether NASDAQ violated its Exchange Act obligation to provide a fair and orderly market in conducting an IPO—is sufficiently significant to the development of a uniform body of federal securities regulation to satisfy the requirement of importance to 'the federal system as a whole.'"); *cf. Dovid v. U.S. Dep't of Agric.*, No. 11 Civ. 2746 (PAC), 2013 WL 775408, at *12 (S.D.N.Y. Mar. 1, 2013) ("A state law cause of action that requires the interpretation of a federal regulation, by itself, is not sufficiently 'substantial' to create federal jurisdiction."), *aff'd sub nom. Congregation Machna Shalva Zichron Zvi Dovid v. U.S. Dep't of Agric.*, 557 F. App'x 87 (2d Cir. 2014).

The Second Circuit has identified characteristics "that in some cases have signaled against substantiality" as including "the retrospective nature of a claim, the propriety of resolving the federal dispute in a state forum, and the absence of a federal remedy. . . ." *NASDAQ OMX Group, Inc.*, 770 F.3d at 1028. "[S]ubstantiality must be determined based on a careful, case-by-case judgment." *Id*.

In analyzing this prong, courts frequently look to the dispositive facts of previous Supreme Court decisions to determine whether the instant issue is important to the federal system as a whole. In *Grable*, the Court described *Smith v. Kan. City Title & Trust Co.*, 255 U.S. 180 (1921) as the "classic example" of where a state law claim "implicate[d] significant federal issues." 545 U.S. at 312. In *Smith*, the plaintiff sought to enjoin the

defendant from investing in bonds issued by the federal government on the grounds that the issuance of those bonds was "beyond the constitutional power of Congress." 255 U.S. at 195. Although the plaintiff's arguments challenged the validity of the securities, "[t]he attack upon the proposed investment in the bonds described [wa]s because of the alleged unconstitutionality of the acts of Congress undertaking to organize the banks and authorize the issue of the bonds." *Id*. at 199. Federal jurisdiction was proper in that case because "the controversy concern[ed] the constitutional validity of an act of Congress which is directly drawn in question." *Id*. at 201.

*Grable* also concerned significant federal affairs. In that case, the Supreme Court determined that there was federal subject matter jurisdiction over the plaintiff's quiet title action because the plaintiff's claim was based upon the alleged failure of the Internal Revenue Service ("IRS") to provide sufficient notice "as defined by federal law." 545 U.S. at 314-15. The *Grable* court stated that "[t]he meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court," and acknowledged the federal government's "strong interest in the 'prompt and certain collection of delinquent taxes.'" *Id*. (quoting *United States v. Rodgers*, 461 U.S. 677, 709 (1983)). The Court further explained that the federal government "has a direct interest in the availability of a federal forum to vindicate its own administrative action" and that "the ability of the IRS to satisfy its claims from the property of delinquents requires clear terms of notice." *Id*. As the Supreme Court subsequently articulated, the dispute in *Grable* "centered on the action of a federal agency (IRS) and its compatibility with a federal statute." *Empire Healthchoice*, 547 U.S. at 700.

With respect to whether the action raises substantial federal issues, the IJC argues that this case raises substantial questions of federal law related to the interpretation of the Boundary Waters Treaty and the system that the IJC has implemented under the Treaty. (Dkt. 11 at 19).  As the IJC argues, by signing the Boundary Waters Treaty, the United States agreed to confer jurisdiction over its boundary waters with Canada to the IJC, and "[a]ny litigation allegation that the IJC failed to take actions required by the Treaty or *Plan 2014*, and that it violated a duty of care found in the Treaty necessarily raises substantial federal questions." (Dkt. 11 at 20).  To hold otherwise, according to the IJC, would subject it to "local courts' varying interpretations of federal (Canadian *and* American) law, each potentially influenced by concerns insular to a particular location."  (Dkt. 11 at 21-22). The results of such a scenario, according to the IJC, "would not only undermine the IJC's ability to carry out its duties under the Treaty, but would also thwart the federally-endorsed purpose of entering the Treaty in the first place: to ensure a uniform and comprehensive approach to management of boundary waters."  (Dkt. 11 at 22).  By contrast, the State argues that this is simply an action for money damages, that neither implicates the United States (which has relinquished authority over the boundary waters to the IJC) nor foreign relations. (Dkt. 13 at 14).

The Court views this element of the *Gunn-Grable* test as presenting the most significant challenge to the exercise of federal jurisdiction, in large part because it is an inquiry that requires a case-by-case analysis and no other court has previously evaluated whether claims such as those made here against the IJC based on alleged violations of a duty imposed by the IJC's regulations and the Boundary Waters Treaty raise a substantial

- 13 -


federal issue. But notwithstanding the lack of precedent, the Court is cognizant that it has a "duty to exercise jurisdiction" if the state law claims asserted here fall within the "limited sphere" of cases meeting the *Gunn-Grable* test. *NASDAQ OMX Group Inc.*, 770 F.3d at 1020. And the Court concludes that the IJC has the better argument here. The United States, along with Canada, created the IJC pursuant to the Boundary Waters Treaty and the IJC, with the consent of the United States and Canada, enacted regulations governing outflows of waters from Lake Ontario through the Dam, which the State now claims were not followed and led to flooding and damage to riparian owners along Lake Ontario who were upstream from the Dam. Allowing a political unit in either Canada or the United States to challenge the actions of this joint commission created by these two countries pursuant to a treaty, based on actions of that commission allegedly in violation of its own regulations enacted with the consent of those two countries, runs against the serious federal interests in having such a matter adjudicated in a federal forum. The Court agrees with the IJC that allowing this type of claim to be litigated in the forum of the political unit bringing the actions—as opposed to a federal forum—would disrupt the federally-endorsed purpose of ensuring a uniform and comprehensive approach to the management of the boundary waters between the United States and Canada. Thus, the Court concludes that the substantial federal issue requirement of the *Gunn-Grable* test has been satisfied.

    4.    <u>Federal-State Balance</u>

The fourth requirement "focuses principally on the nature of the claim, the traditional forum for such a claim, and the volume of cases that would be affected. Absent a special state interest in a category of litigation, or an express congressional preference to

avoid federal adjudication, federal questions that implicate substantial federal interests will often be appropriately resolved in federal rather than state court." *Jacobson*, 824 F.3d at 316.

The IJC argues that the foreign policy concerns implicated by this action are particularly acute where any outcome would necessarily impact not only the United States, but also Canada. (Dkt. 11 at 22-23). Moreover, because of the strong congressional preference contained in the International Organizations Immunities and Foreign Sovereign Immunities Acts for foreign states and international organizations to be subject to jurisdiction in federal (not state) courts, the IJC argues that this compels the conclusion that federal court is the appropriate forum for this action. (Dkt. 11 at 23). Moreover, the IJC argues that maintaining federal jurisdiction over this action will not "upset the federal-state division of labor" as the scope of the Treaty is narrow and in the over 100 years since it was adopted, cases in federal court implicating the Treaty have been rare. (Dkt. 11 at 23). By contrast, the State argues that that this is simply a tort suit which is traditionally a state case. (Dkt. 13 at 15). The State contends that recognizing federal question jurisdiction over a tort case like this would "'herald[] a potentially enormous shift' and 'increased volume of federal litigation.'" (*Id*. (quoting *Grable*, 545 U.S. at 319)).

Again, the IJC has the better argument. Not only is litigation against the IJC like this rare, but as discussed above, permitting a political unit such as the State to bring these types of claims implicating substantial federal issues in its own local court, as opposed to a federal forum, would disrupt the federal-state balance. The Court concludes that this federal forum is the more appropriate place to resolve this dispute.

D.    Other Issues Raised by the Parties

The IJC raises a number of other grounds in support of its removal to federal court, including some novel theories such as that the IJC has a statutory right to remove to federal court under 28 U.S.C. § 1441(d). (*See generally* Dkt. 11). Because the Court has concluded that federal jurisdiction may be exercised pursuant to the *Gunn-Grable* test, it need not and does not resolve whether federal jurisdiction is appropriate based on the other arguments asserted by the IJC.

In addition, the State focuses much of its argument (particularly in its opening brief) on *Dreyfus v. Von Finck*, 534 F.2d 24 (2d Cir. 1976), where the Second Circuit affirmed the dismissal of a complaint premised on alleged tortious conduct in violation of various treaties because no private right of action could be based on the four treaties referred to in the complaint. *Dreyfus*, decided decades before *Gunn* and *Grable* were decided by the Supreme Court, has no bearing on the Court's analysis set forth above that federal jurisdiction is appropriate under the substantial federal question doctrine.

IV.   **INTERLOCUTORY APPEAL**

With exceptions not relevant here, interlocutory orders in federal court proceedings are not appealable as of right. However:

> When a district judge, in making in a civil action an order not otherwise appealable . . ., shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall

> not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b). In this case, for the reasons discussed above, the Court concludes that there is a controlling question of law as to which there is a substantial ground for difference of opinion—namely, whether the Court has subject matter jurisdiction pursuant to *Gunn* and *Grable*. Further, resolution of this issue would materially advance the ultimate termination of the litigation. In particular, the Court wishes to avoid a situation in which litigation continues in this forum, only for an appellate court to conclude that subject matter jurisdiction was lacking. Accordingly, the Court will afford the State an opportunity to apply to the Second Circuit for an interlocutory appeal pursuant to § 1292(b). Further, in the event the State elects to make such an application, the Court will stay the matter until the application is denied or, if it is granted, until the appeal is resolved.

## V.  **CONCLUSION**

For the foregoing reasons, the motion to remand (Dkt. 10) is denied. Pursuant to the Scheduling Order entered by the Court (Dkt. 9), the IJC must respond to the complaint by motion or answer within 30 days of the date of this Decision and Order. However, the Court holds that deadline in abeyance for ten days, to permit the State an opportunity to seek an interlocutory appeal, should it wish to do so. In the event the State elects to apply for leave to bring an interlocutory appeal, this action will be stayed until the application is denied or, if it is granted, until the appeal is resolved. If the State does not file an application for an interlocutory appeal within ten days of the date of this Decision and

Order, then the 30-day deadline for IJC to answer or otherwise respond to the complaint shall begin running.

    SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:    September 13, 2021
           Rochester, New York